937 P.2d 960

STATE of Idaho, Plaintiff–Respondent,

v.

Marc Aaron MITCHELL,
Defendant–Appellant.

No. 22854.

Court of Appeals of Idaho.

May 1, 1997

Gregory A. Jones, Bonner County Public Defender, Priest River, for defendant–appellant.

Alan G. Lance, Attorney General, Catherine O. Derden, Deputy Attorney General, Boise, for plaintiff–respondent. Catherine O. Derden argued.

LANSING, Judge.

The appellant, Marc Aaron Mitchell, challenges the sufficiency of the trial evidence to support a jury verdict finding him guilty of delivery of a controlled substance. The substance delivered during the transaction in question was not recovered by the police and therefore was not identified by chemical analysis. We hold that circumstantial evidence indicating that the delivered substance was methamphetamine was sufficient to support the verdict, and we therefore affirm the judgment of conviction.

## FACTS

The circumstances giving rise to Mitchell's arrest were described as follows through testimony presented at trial. Larry Moore, a confidential informant working with the police, received a telephone call from Mitchell in which Mitchell said he had some methamphetamine to sell. Moore made arrangements to meet Mitchell in a parking lot. Before Moore met with Mitchell, Officers Moe and Gow of the Bonner County Sheriff's Department searched Moore and his car, gave Moore $125 for the purchase and attached to him a transmission device, known as a "body wire," so that the officers could listen to the transaction. When Moore and Mitchell met, Moore gave Mitchell $125 for a "teener."[1] Mitchell indicated that he did not have the product on him but would have to get it from a nearby house where it was being weighed. After waiting for Mitchell for some time, Moore drove into the driveway of the house that Mitchell had entered. Mitchell came out to Moore's car and handed Moore a film canister. Mitchell stated that this was part of the quantity that Mitchell had paid for and that the rest was still being weighed in the house. Moore removed the lid from the canister and observed within it two clear straws containing a tan powder. Moore placed the canister on the front seat of the car and waited in the car for Mitchell to return with the balance of Moore's purchase. Unbeknownst to Moore, Mitchell had apparently observed the body wire on Moore when he delivered the film canister. Mitchell came back from the house with a confederate named Pete Torres, who grabbed Moore by the hair, held a screwdriver to his throat and threatened to kill him. While Torres and Moore were struggling, Moore saw Mitchell reach into the car and pull his hand out in a closed fist. Officers Gow and Moe, who were listening to and observing the transaction from a distance, arrived quickly and saw Mitchell running away. When Moore's car was searched, the film canister was no longer there, and it was never found by the police.

Mitchell was subsequently arrested and charged with delivery of a controlled substance, methamphetamine, I.C. § 37–2732(a)(1)(A). A jury found him guilty of the charge. Mitchell then filed a motion for a judgment of acquittal pursuant to I.C.R. 29(c), asserting that the verdict was not supported by substantial, competent evidence. This motion was denied, and the court entered a judgment of conviction, imposing a unified four-year sentence with a one and one-half-year minimum term of imprisonment.

On appeal, Mitchell renews his argument that there was not legally sufficient evidence to support the finding of guilt. He argues that because the delivered substance was not recovered by the police and tested, the jury could not properly find that it was methamphetamine.

## ANALYSIS

Appellate review of the sufficiency of evidence supporting a criminal conviction is limited. A verdict will not be set aside if there is substantial evidence upon which a rational trier of fact could find the essential elements of the crime to have been proved beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979), *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State v. Filson*, 101 Idaho 381, 386, 613 P.2d 938, 943 (1980); *State v. Reyes*, 121 Idaho 570, 826 P.2d 919 (Ct.App.1992). Evidence is regarded as substantial if a reasonable trier of fact would accept it and rely upon it in determining whether a disputed point of fact has been proved. *Ortiz v. Dep't of Health & Welfare*, 113 Idaho 682, 683–84, 747 P.2d 91, 92–93 (Ct.App.1987). In deference to the jury's role of assessing the credibility of witnesses, weighing the evidence, and determining the reasonable inferences to be drawn therefrom, in reviewing a guilty verdict the appellate court views the evidence in the light most favorable to the prosecution. *State v. Knutson*, 121 Idaho 101, 822 P.2d 998 (Ct.App.1991); *State v. Decker*, 108 Idaho 683, 701 P.2d 303 (Ct.App.1985).

---

1. Moore testified that a "teener" of methamphetamine is seven "quarters." He said a quarter is a 2.5 weight on a grain scale and would fill up about an inch of a regular drinking straw.

■ Mitchell's appeal presents the question whether a chemical analysis is essential to the prosecution of a drug offense, or whether circumstantial evidence, standing alone, may be sufficient to prove the identity of the substance. Although this precise issue has apparently not previously been presented to the Idaho appellate courts, it has long been held in this state that the government's burden to prove the elements of an offense may be met with wholly circumstantial evidence. *State v. Chapple*, 98 Idaho 475, 567 P.2d 20 (1977); *State v. Ponthier*, 92 Idaho 704, 449 P.2d 364 (1969); *State v. Simmons*, 120 Idaho 672, 679, 818 P.2d 787, 794 (Ct. App.1991).

Mitchell has not brought to our attention any authorities holding that a chemical analysis is necessary for proof of the identity of a controlled substance. Our research, however, reveals that a great many jurisdictions hold that the identity of a controlled substance may be proved by circumstantial evidence. Many of these authorities are surveyed by the Kansas Court of Appeals in *State v. Northrup*, 16 Kan.App.2d 443, 825 P.2d 174 (1992), where it was observed that the courts of at least six federal circuits and twenty-three states had theretofore concluded that the burden of proving a controlled substance may be met with circumstantial evidence. *Id.* 825 P.2d at 177. In addition to the jurisdictions identified in *Northrup*, the state of Wyoming has also subscribed to that view. *See Urrutia v. State*, 924 P.2d 965 (Wyo.1996). A leading case on this issue, *United States v. Dolan*, 544 F.2d 1219 (4th Cir.1976), describes some of the circumstances that may contribute to proof that an untested material is a controlled substance:

Such circumstantial proof may include evidence of the physical appearance of the substance involved in the transaction, evidence that the substance produced the expected effects when sampled by someone familiar with the illicit drug, evidence that the substance was used in the same manner as the illicit drug, testimony that a high price was paid in cash for the substance, evidence that transactions involving the substance were carried on with secrecy or deviousness, and evidence that the substance was called by the name of the illegal narcotic by the defendant or others in his presence.

*Id.* at 1221.

We perceive no reason to differentiate the identity of controlled substances from other elements of criminal offenses with respect to the rule permitting proof through circumstantial evidence. We hold, therefore, that circumstantial evidence may be sufficient to prove the identity of a substance where laboratory analysis is not available.

Our holding does not alter the State's burden of proof; it remains incumbent upon the State to provide evidence that meets the standard of proof beyond a reasonable doubt. Chemical analysis of a substance remains the preferable and the most reliable evidence of its identity, and the sufficiency of less direct evidence must be evaluated on a case-by-case basis.

■ We turn, therefore, to a review of the evidence presented in this case to assess whether it was adequate to allow a reasonable juror to conclude beyond a reasonable doubt that the substance delivered by Mitchell to Moore was methamphetamine. We conclude that the evidence met this standard. Moore, the confidential informant, testified to his experience with methamphetamine and his experience with Mitchell. He testified that, prior to this purchase, he had purchased and used methamphetamine five or six times. In those prior purchases the methamphetamine usually was packaged in straws or bindles. When a straw was used, the straw was burned at one end, the methamphetamine was put into the straw and the straw was then burned at the other end to seal it. The substance that was delivered to Moore in the film canister was packaged by this method. Moore's testimony about how methamphetamine is commonly packaged was corroborated by Officer Moe, who had been assigned to narcotics cases for two and one-half years. Moore also explained to the jury that methamphetamine may appear as a smooth powder or may look rocky depending on how it has been chopped up.

Moore testified that earlier in the summer of 1995 he had made at least three purchases of methamphetamine from Mitchell, and at

least one such purchase had been for a "teener" and had cost him $125. Moore also testified that in his previous purchases from Mitchell, Mitchell had personally brought the methamphetamine to Moore, and it was usually packaged in a straw. Moore said that when he had used methamphetamine previously purchased from Mitchell, its effect on Moore was consistent with the effect of other methamphetamine he had used, although the methamphetamine he had purchased from other sources had "amped" him more. All of the foregoing testimony established that Moore was familiar with methamphetamine.

As to the purchase at issue in this case, Moore testified that Mitchell had initiated the transaction by offering to sell "methamphetamine" to Moore. Moore gave Mitchell $125 for a "teener," the same price that Moore had previously paid for methamphetamine. Officer Moe, who was listening to Mitchell's and Moore's conversation over a transmission device, confirmed Moore's description of the transaction. Moore testified that the film canister given to him by Mitchell contained two clear straws with a tannish colored powder inside that looked like methamphetamine.

After apparently discovering that Moore was wearing a wire, Mitchell reached into Moore's car and then pulled out his hand in a closed fist and ran away. From this evidence, the jury could conclude that Mitchell fled with the film canister and its contents. This conduct by Mitchell allows a further inference that he had indeed delivered methamphetamine to Moore and was anxious to recover and dispose of it when he became aware of Moore's body wire.

Mitchell argues that because the officers who came to Moore's rescue were wearing plain clothes and had weapons, Mitchell may have run off in fear, not knowing they were police officers. However, Mitchell had reached into the car *before* the police arrived, and the jury could reasonably infer that Mitchell had seen the wire on Moore and feared that the police would soon appear.

Mitchell further points out that Moore's ability to recognize methamphetamine was drawn into question when Moore became confused at trial by an illustrative exhibit made up by the State. The exhibit consisted of pieces of straws that were filled with hot apple cider mix, sealed at both ends by burning, and placed in a film canister to duplicate the appearance of the material delivered to Moore. Moore mistakenly thought that this was the actual canister that had been delivered by Mitchell, and he testified that he recognized it as such. This mistake was brought to the jury's attention. Upon further questioning, however, Moore explained that the illustrative exhibit was consistent in appearance with the items delivered to him by Mitchell. It was up to the jury to weigh the reliability of Moore's testimony.

The entirety of the evidence, when viewed in the light most favorable to the State, is sufficient to support the jury's inference that the substance delivered by Mitchell was methamphetamine.

### CONCLUSION

We hold that a chemical analysis, though preferable, is not essential to prove the identity of a controlled substance. We further hold that substantial evidence was presented at Mitchell's trial from which the jury could properly find that the substance he delivered was methamphetamine. Therefore, the district court's order denying Mitchell's motion for a judgment of acquittal is affirmed.

WALTERS, C.J., and PERRY J., concur.

937 P.2d 1212

**Jessie Anna MORRIS, a Minor By and Through Jackie MORRIS, her Mother and Natural Guardian, Plaintiff–Appellant,**

v.

**James THOMSON, M.D., individually, Defendant–Respondent.**

No. 22202.

Supreme Court of Idaho,
Boise, December 1996 Term.

May 15, 1997.

Wilson & McColl, Boise, for plaintiff–appellant. Debrha J. Carnahan argued.

Quane, Smith, Howard and Hull, Boise, for defendant–respondent. Jeremiah A. Quane, argued.

TROUT, Chief Justice.

This is an appeal from a jury verdict and judgment for defendant Dr. James Thomson in a medical malpractice suit.

## I.

### BACKGROUND

On July 4, 1988, Jessie Morris (Jessie) was born to Jackie Morris (Morris) at Walter Knox Memorial Hospital in Emmett, Idaho. Dr. James Thomson, a family practitioner in Emmett and Morris' treating physician during her pregnancy, delivered Jessie, who experienced birth asphyxia (oxygen deprivation immediately before or after birth). As a result, she suffers from severe mental retardation, cerebral palsy, vision impairment, microcephaly (small head), and paralysis.

## II.

### PROCEDURAL HISTORY

On May 11, 1990, Jackie Morris, on behalf of her daughter, filed a medical malpractice suit against Dr. Thomson and Walter Knox Memorial Hospital. Morris and the hospital reached a settlement prior to trial. At trial, Morris alleged that Thomson did not meet the required standard of care by improperly using a fetal heart monitor, improperly interpreting the fetal heart monitor data, failing

to use a fetal scalp monitor, and failing to recognize signs of distress after birth and to begin immediate resuscitation efforts. The jury returned a verdict for Dr. Thomson on April 24, 1995. On May 24, 1995, Morris filed motions for a new trial and to alter or amend the judgment. On August 31, 1995, the district court denied these motions. Morris subsequently appealed to this Court several of the court's rulings made prior to and during the trial.

## III.

## DISCUSSION

### A. The district court's refusal to automatically dismiss for cause all potential jurors having a doctor-patient relationship with defendant Dr. Thomson.

At the beginning of jury selection, Morris sought to automatically excuse for cause all potential jurors who were patients of Dr. Thomson on the ground that a business relationship existed between them and the defendant. *See* I.R.C.P. 47(h)(3). The court denied this request, ruling that plaintiff would have to question each individual juror on this issue. Morris appeals this ruling.

Plaintiff urges this Court to adopt a per se rule in medical malpractice actions automatically disqualifying all prospective jurors with current doctor-patient relationships with the defendant. We decline to do so. The court in *Poynter ex rel. Poynter v. Ratcliff*, 874 F.2d 219 (4th Cir.1989), addressed the issue of whether to adopt such a rule. The court refused to do so on the ground that per se rules should be created only in exceptional situations where "circumstances, such as a [a juror's] financial interest in the trial's outcome, show a clear likelihood of prejudice." *Id.* at 222. The doctor-patient relationship, however, does not create a clear risk of prejudice. *Id.* Although the bond between a doctor and a particular patient may pose such a risk, the determination of whether the doctor-patient relationship affects a juror's impartiality should be made on an individual basis:

> Although a particular patient or malpractice defendant might warrant, or require,

excuse for cause in a given case, we do not think that either circumstance necessarily impairs a juror's partiality or prevents him from rendering a decision based solely on the evidence and the law. The decision whether to exclude [current patients] should be made in each instance on the particular facts involved and under the established principles governing excuse for cause.

*Id.* (footnote omitted).

█ This reasoning is persuasive, and we likewise refuse to create a per se rule automatically disqualifying such jurors. By requiring counsel to question individually each prospective juror regarding his or her relationship with defendant, counsel will be able to uncover any bias and to challenge such a juror for cause. As the case at bar demonstrates, the court will likely dismiss these jurors on the ground that they are biased. A per se rule would thus provide no protection for plaintiffs in medical malpractice cases that they do not already enjoy. In medical malpractice actions, then, the parties may challenge for cause current and/or former patients of the defendant doctor or remove them through use of peremptory challenges.

█ Plaintiff also argues that these jurors should have been excused pursuant to I.R.C.P. 47(h)(3) as being "united in business" with defendant. I.R.C.P. 47(h)(3) provides that one basis for a challenge for cause is "being ... united in business with either party." A doctor-patient relationship, however, does not fall within this provision. This Court has examined the phrase "united in business" found in an earlier (but identical) version of this rule. *See Hall v. Chattin*, 17 Idaho 664, 106 P. 1132 (1910). "Business" for purposes of that section constituted "commercial, industrial and professional enterprises and engagements into which men jointly enter." *Id.* at 668, 106 P. at 1133. We noted that the purpose behind this provision was to exclude from juries those individuals whose business or financial interests could be affected by the outcome of the litigation: "It was evidently not thought wise or in the interests of justice to have a man's business associate act as a juror in a case where his business,

moneyed, or other interests are at stake." *Id.*, 106 P. at 1133. Clearly, a doctor-patient relationship does not implicate a juror's financial interests. By participating in a verdict against his or her doctor in a medical malpractice action, a juror does not affect his or her financial or business interests. The doctor-patient relationship thus does not create the sort of bias that the rule seeks to prevent, and the "united in business" provision does not apply. The court thus correctly refused to automatically dismiss the jurors on this ground.

■ Plaintiff also objected specifically to certain jurors included in the panel on the basis that they, or their family members, are or were patients of Dr. Thomson. The record indicates, however, that Morris failed to challenge for cause the majority of these jurors, and the court excused all of the jurors plaintiff challenged for cause on the basis of their relationship with defendant, with the exception of Juror Hill (which will be discussed below). These excused jurors, of course, present no issue on which Morris can appeal. With regard to the other jurors plaintiff failed to challenge, plaintiff waived all objections to them by passing them for cause. *State v. Mitchell*, 104 Idaho 493, 501, 660 P.2d 1336, 1344, *cert. denied*, 461 U.S. 934, 103 S.Ct. 2101, 77 L.Ed.2d 308 (1983); *State v. Bitz*, 93 Idaho 239, 243, 460 P.2d 374, 378 (1969); *State v. Yon*, 115 Idaho 907, 909, 771 P.2d 925, 927 (Ct.App.1989). Plaintiff has thus failed to preserve this issue for appeal.

**B. The district court's refusal to dismiss for cause Mrs. Hill, a potential juror with a doctor-patient relationship with defendant Dr. Thomson.**

The second prospective juror questioned, Mrs. Hill, was a former (and possibly current) patient of Dr. Thomson.[1] Morris challenged Hill for cause. After further questioning by both the defense and the court, the court satisfied itself that Hill could remain impartial and denied plaintiff's motion to excuse her for cause. Morris subsequent-ly passed Hill for cause but used a peremptory challenge to remove her. Morris appeals the trial court's denial of this challenge.

■ It is in the trial court's discretion to determine whether a juror can render a fair and impartial verdict. *State v. Hedger*, 115 Idaho 598, 600, 768 P.2d 1331, 1333 (1989); *Quincy v. Joint Sch. Dist. No. 41, Benewah County*, 102 Idaho 764, 768, 640 P.2d 304, 308 (1981). On appeal, we review the trial court's selection of jurors for an abuse of discretion. *Hedger*, 115 Idaho at 600, 768 P.2d at 1333; *Quincy*, 102 Idaho at 768, 640 P.2d at 308. In ruling on a challenge for cause, the trial court must consider the facts and decide if the juror should be excused pursuant to I.R.C.P. 47(h), which sets forth the grounds for challenges for cause. *Quincy*, 102 Idaho at 768, 640 P.2d at 308.

■ The trial court in this case did not abuse its discretion in refusing to dismiss Hill for cause. In the two Idaho cases addressing this issue, the Court has ruled that a trial court does not abuse its discretion by refusing to excuse for cause jurors whose answers during voir dire initially give rise to challenges for cause but who later assure the court that they will be able to remain fair and impartial:

> Although the *voir dire* of Mr. Pugh [the prospective juror] by plaintiff's counsel initially gave reason to challenge for cause, subsequent questioning by the court clarified the responses of Mr. Pugh so as to give the court ample basis for concluding that Mr. Pugh would serve as a fair and impartial juror. In view of these answers given by Mr. Pugh to the court's questions, it was clearly within the court's discretion to deny plaintiff's challenges for cause.

*Quincy*, 102 Idaho at 768, 640 P.2d at 308. *See also Hedger*, 115 Idaho at 600, 768 P.2d at 1333 (upholding trial court's decision, in trial of defendant on criminal charges including rape, refusing to excuse for cause prospective juror whose first husband had been convicted of rape, whose current husband had pled guilty to sexual abuse three years

---

1. It is unclear from the record whether Hill was a current or former patient. She stated that Dr. Thomson had taken over from her original doc-tor and that if she were to go back to a doctor, she would probably return to him. She had not, however, seen him in over one year.

previously, and who had worked for two years with a support group for victims of domestic abuse).

Such a situation exists in this case. Hill initially stated during voir dire that she believed that her relationship with Dr. Thomson could affect her ability to render a verdict fair to plaintiff. Such bias is a ground for a challenge for cause. *See* I.R.C.P. 47(h)(7). Further questioning by defense counsel, however, elicited Hill's assurance that she would put aside her relationship with Dr. Thomson, endeavor to remain impartial, and follow the court's instructions:

Q: .... does that mean that you couldn't be impartial and fair?

A: No. I can understand—my three daughters are perfectly healthy, but I can see where she is coming from.

Q: Because her child is handicapped.

A: Yes.

Q: Well, because you think that you wouldn't want someone in your frame of mind sitting on your jury if you were bringing a case, does that mean that you—you wouldn't certainly be unfair to either side, I take it.

A: No, I wouldn't.

Q: And you would obey the judge's instructions, I take it.

A: Yes, I would.

Q: And you would be as impartial as possible.

A: Yes, I would.

\* \* \*

Q: I take it that if you do get selected to sit on a jury, you would give the Court your assurances, and the rest of us, that despite your knowledge of Dr. Thomson, ... that you would follow the Court's instructions and be impartial.

A: Yes, I would.

The court further questioned Hill regarding any potential bias:

Q: Mrs. Hill, as I understand it, your response to the plaintiff was that you were thinking that she may not want to have somebody that is connected to the doctor in some fashion sit in the jury. What I am asking you is, can you put that relationship aside?

A: Yes.

Q: —and hear what is going to be presented by both sides, and then whatever you determine the facts to be, be able to apply the law that the Court will instruct you on and come to your own decision.

A: Yes, I could.

Q: And you could do it without being biased towards one party or the other.

A: Yes.

Court: I will deny the motion to excuse for cause.

The court did not deny plaintiff's challenge until it had assured itself that Hill could remain impartial. The court thus did not abuse its discretion by failing to dismiss her for cause.

## C. Communications between defense counsel and Jessie's former treating physicians without notice to plaintiff and outside the course of formal discovery.

During the course of the trial, Morris discovered that Thomson's attorney had spoken, without notice to plaintiff and outside formal discovery channels, with two physicians who had treated Jessie during the first month of her life. Thomson retained one of these physicians, Dr. Sell, as an expert witness. At the time of trial, however, Dr. Sell refused to testify. Morris called Dr. Watkins, the other physician, as a fact witness and learned of defense counsel's contact during Dr. Watkins' testimony. Plaintiff asserts that these communications between defense counsel and plaintiff's former treating physicians were improper because they occurred outside the procedures outlined in the discovery rules and argues that they constitute error because they resulted in changes in the doctors' testimony at trial.

### 1. Dr. Sell

■ Plaintiff cannot assert error with regard to Dr. Sell because she has not demonstrated that defense counsel's communication

with Dr. Sell in any way prejudiced her. The record does not indicate that their discussion had any effect on Dr. Sell's opinion or on his testimony, as he did not testify at trial.

## 2. Dr. Watkins

 Morris did not object at trial to defense counsel's ex parte communication with Dr. Watkins and thus did not preserve this issue for appeal. *Lawton v. City of Pocatello*, 126 Idaho 454, 464–65, 886 P.2d 330, 340–41 (1994); *Lankford v. Nicholson Mfg. Co.*, 126 Idaho 187, 189, 879 P.2d 1120, 1122 (1994). *See also Pearce v. Ollie*, 121 Idaho 539, 540, 826 P.2d 888, 889 (1992) (learning that defense counsel had conducted ex parte interviews with plaintiff's treating physicians and had retained them as witnesses for the defense, plaintiff moved to prevent the defense from calling these witnesses).

 Furthermore, the formal discovery rules do not preclude informal communications between defense counsel and ordinary fact witnesses. It is clear that plaintiff did not retain Dr. Watkins as an expert witness in anticipation of litigation and did not call Dr. Watkins to testify regarding any expert opinions formed. Instead, plaintiff called Dr. Watkins to testify to her direct observations of Jessie. As a fact witness, the discovery rules do not limit defense counsel's access to Dr. Watkins, and the defense is free to speak to the witness if she is willing.

## D. The district court's refusal to allow Morris to question her own witness, Dr. Watkins, regarding prior statements the witness made concerning her opinion as to the timing of Jessie's injuries.

During Morris' direct examination of Dr. Watkins, counsel repeatedly used the term "birth asphyxia." Defense counsel apparently feared that the jury would construe this term to mean that Dr. Watkins was opining that the injuries occurred during the birthing process. Consequently, in his cross-examination, defendant attempted to clarify whether Dr. Watkins was offering an opinion as to the timing of Jessie's injuries, and Dr. Watkins asserted that she had no opinion as to

the timing of the events leading to Jessie's condition. In her redirect, Morris attempted to show that Dr. Watkins did indeed have such an opinion and that the doctor had expressed that opinion to plaintiff's counsel during a prior conversation. The defense objected, and the court sustained the objection, apparently on the ground that plaintiff had not called Dr. Watkins as an expert qualified to render such an opinion.

 We do not address this issue because Morris has not preserved it for appeal. I.R.E. 103(a)(2) provides that a party can only assert error on the part of the trial court in excluding evidence where the party made an offer of proof at trial describing the substance of the evidence sought to be admitted. Plaintiff, however, did not make an offer of proof regarding the testimony she intended to elicit from Dr. Watkins on redirect, and we thus do not have any basis on which to rule.

## E. The district court's striking a portion of the testimony of plaintiff's expert witness, Dr. Giles, that referred to the standard of care requiring the use of a fetal scalp monitor.

Prior to the beginning of trial, Morris moved to exclude evidence pertaining to her history of sexually-transmitted diseases (STDs). The judge granted the motion, ruling that no mention could be made of Morris' history due to the highly prejudicial impact such evidence could have on the jury. During her case-in-chief, Morris called an expert witness, Dr. Giles, to testify to the standard of care required of a family practitioner in Emmett, Idaho, at the time of Jessie's birth. Among other things, Dr. Giles testified that the standard of care required that a fetal scalp monitor be used when a fetus exhibits signs of distress such as Jessie's. To rebut this testimony, the defense during its case-in-chief called Dr. Clark, another expert witness. The defense made an offer of proof outside the presence of the jury that Dr. Clark would testify that Morris' history of STDs contraindicated the use of a fetal scalp monitor because the electrode pierces the scalp of the fetus and exposes the fetus to

potential infection. Morris continued to object strongly to any reference to STDs, and the court refused to allow any mention of the mother's medical history. Defendant then moved to strike that portion of Dr. Giles' testimony referring to the standard of care requiring the use of a fetal scalp monitor. The court granted the motion and instructed the jury to disregard that portion of Dr. Giles' testimony.

■ Again, Morris asserts that the district court erroneously excluded evidence. The Court reviews trial court decisions admitting or excluding evidence, including the testimony of expert witnesses, under the abuse of discretion standard. *Burgess v. Salmon River Canal Co., Ltd.*, 127 Idaho 565, 574, 903 P.2d 730, 739 (1995). In the case of an incorrect ruling regarding evidence, a new trial is merited only if the error affects a substantial right of one of the parties. I.R.C.P. 61; I.R.E. 103; *Burgess*, 127 Idaho at 574, 903 P.2d at 739; *Hake v. DeLane*, 117 Idaho 1058, 1065, 793 P.2d 1230, 1237 (1990).

■ Morris first argues that the district court erred in striking this testimony because defendant's motion to strike was untimely. Regardless of whether the motion was untimely, the trial court may exclude evidence offered by a party on its own authority, without a motion to strike or an objection made by the opposing party. *See Hecla Mining Co. v. Star–Morning Mining Co.*, 122 Idaho 778, 782–83, 839 P.2d 1192, 1196–97 (1992).

■ We hold that the trial court did not abuse its discretion in excluding the testimony at issue. The court was in a difficult position. Had the court refused to allow the defense to present evidence regarding Morris' history of STDs and also refused to strike Dr. Giles' testimony regarding the use of a fetal scalp monitor, substantial rights of *defendant* would have been impaired. Such a ruling would have considerably prejudiced defendant by preventing him from rebutting one allegation that he had violated the applicable standard of care. The judge's decision to exclude all reference to Morris' medical history to prevent prejudice to Morris would,

in the specific instance of Dr. Giles' testimony on this point, have seriously prejudiced defendant. The court remedied this situation by striking that portion of Dr. Giles' testimony. In this manner, it prevented prejudice both to Morris (by not allowing defendant to refer to Morris' medical history) and to Thomson (by striking testimony of Morris' witness that Thomson could not rebut without referring to this medical history). This ruling was a reasonable compromise and did not constitute an abuse of discretion.

**F. Special verdict form and Jury Instruction No. 15, which instructed the jury on the standard of care in medical malpractice cases.**

*1. Special verdict form*

Morris did not discuss this issue in her briefs submitted to this Court. We thus refuse to address it. *City of Sun Valley v. Sun Valley Co.*, 128 Idaho 219, 223, 912 P.2d 106, 110 (1996) ("We will not address issues on appeal which are completely without support, argument, or authority.").

*2. Jury Instruction No. 15*

■ The district court gave the following instruction to the jury regarding the standard of care in medical malpractice cases:

The Idaho statute governing the proof of community standard of health care practice in a malpractice case provides, in relevant part, as follows: In any claim for damages against any physician such plaintiff must, as an essential part of his or her case in chief, affirmatively prove by direct expert testimony and by a preponderance of all the competent evidence, that such physician then and there negligently failed to meet the applicable standard of health care practice of the community in which such care allegedly was or should have been provided, as such standard existed at the time and place of the alleged negligence of such physician and as such standard then and there existed with respect to the class of physician that such physician then and there belonged to and in which capacity he or she was functioning.

Such physician shall be judged in such cases in comparison with similarly trained and qualified physicians of the same class in the same community, taking into account his or her training, experience, and fields of medical specialization, if any. *If there be no other like physician in the community and the standard of practice is therefore indeterminable, evidence of such standard in similar Idaho communities at said time may be considered.*

The term "community" refers to that geographical area ordinarily served by the licensed general hospital at or nearest to which such care was provided.

(emphasis added). Although Morris did not object to this instruction at trial, the challenge to a jury instruction is nonetheless preserved for appeal. *Lubcke v. Boise City/ Ada County Hous. Auth.,* 124 Idaho 450, 463, 860 P.2d 653, 666 (1993). On appeal, we review the jury instructions as a whole to determine whether they "fairly and adequately present the issues and state the applicable law." *Lawton,* 126 Idaho at 462, 886 P.2d at 338. If an instruction misleads the jury or prejudices one of the parties, reversible error occurs. *Id.,* 886 P.2d at 338.

Morris' objection focuses upon the italicized portion of the instruction regarding proof of the local standard of care. Morris contends that the instruction erroneously limits the jury's consideration of the standard of care in "similar" communities to situations where, within the local community, there is no doctor (other than defendant) competent to testify to the local standard of care. Thus, according to Morris, the judge instructed the jury to ignore the testimony of Morris' expert, Dr. Giles, because Dr. Holverson, a doctor practicing in the local community and the defense's expert witness, was qualified to give an opinion as to the local standard of care. Morris argues that this is contrary to both statutes and case law which establish that plaintiffs may call non-local, and even out-of-state, experts to testify to the standard of care. Morris' argument fails for two reasons.

■ First, the instruction given mirrors the language of I.C. § 6–1012, which defines the standard of care in medical malpractice actions in Idaho. Section 6–1012 provides, in relevant part: "If there be no other like provider in the community and the standard of practice is therefore indeterminable, evidence of such standard in similar Idaho communities at said time may be considered." We have consistently upheld instructions based upon § 6–1012 as correctly explaining to the jury the applicable standard of care. *Leazer v. Kiefer,* 120 Idaho 902, 905, 821 P.2d 957, 960 (1991); *Robertson v. Richards,* 115 Idaho 628, 633, 769 P.2d 505, 510 (1987) (on rehearing, 1989). In addition, the instructions upheld in *Robertson* are very similar to those at issue in the instant case.[2] *Robertson,* 115 Idaho at 633 n. 4, 769 P.2d at 510 n. 4. In *Leazer,* we stated that we preferred the instructions given in *Robertson* because they "accurately state the standard of care pursuant to I.C. § 6–1012." *Leazer,* 120 Idaho at 906, 821 P.2d at 961.

Second, the relevant statutes and case law support the instruction as given. Section 6–1012 provides that plaintiffs may refer to the standard of care in similar communities when the standard of care in the same community is indeterminable because no doctor other than defendant practices in that community.

* * *

2. The court in *Robertson* instructed the jury:
 INSTRUCTION NO. 12
 The plaintiffs in a medical malpractice case have the burden of proving, by direct expert testimony and by a preponderance of all competent evidence, that *at the time and place of the alleged incident* in question, the defendant negligently failed to meet the applicable standard of health care practiced *in the community in which such care allegedly was or should have been provided* as such standard then existed with respect to the class of health care provider to which the defendant belonged and in which he was functioning.

INSTRUCTION NO. 13
An individual provider of health care, such as the defendant in this case, shall be judged in comparison with similarly trained and qualified providers of the same class *in the same community,* taking into account training, experience, and field of specialization.
*Robertson,* 115 Idaho at 633 n. 4, 769 P.2d at 510 n. 4 (emphasis added). The instruction makes no mention of establishing the applicable standard of care by reference to similar communities.

Morris argues that § 6–1013 and case law modify this portion of § 6–1012 to broaden the context in which plaintiffs may refer to the standard of care in similar communities. Morris, however, is incorrect. Section 6–1013, entitled "Testimony of expert witness on community standard," establishes the method by which both local and non-local experts may testify regarding the standard of care:

> The applicable standard of practice and such a defendant's failure to meet said standard must be established in such cases by such a plaintiff by testimony of one (1) or more knowledgeable, competent expert witnesses, and such expert testimony may only be admitted in evidence if the foundation therefor is first laid, establishing (a) that such an opinion is actually held by the expert witness, (b) that the said opinion can be testified to with reasonable medical certainty, and (c) that such expert witness possesses professional knowledge and expertise coupled with actual knowledge of the *applicable said community standard* to which his or her expert opinion testimony is addressed; provided, this section shall not be construed to prohibit or otherwise preclude a competent expert witness who resides elsewhere from *adequately familiarizing himself* with the standards and practices of *(a particular) such area* and thereafter giving opinion testimony in such a trial.

(emphasis added). This section does not require the *court to allow non-local experts to* testify regarding the standard of care in "similar" communities. Instead, it allows non-local experts to familiarize themselves with the "applicable said community standard." Section 6–1012, in turn, defines the applicable community standard in specific instances. As we have already explained, that section provides that a plaintiff may establish the community standard of care by reference to similar communities only where no local doctor other than the defendant exists and the local standard is thus indeterminable. In the instant case, Dr. Holverson was a doctor practicing in the relevant community at the time of Thomson's alleged malpractice. The local standard of care was thus determinable, and § 6–1012 does not allow Morris to establish the standard of care by reference to the standard in similar communities. Thus, the judge correctly instructed the jury.

Contrary to Morris' assertions, the associated case law does not lead to a different conclusion. We have upheld trial court decisions holding that plaintiffs' non-local experts did not familiarize themselves adequately with the standard of care in the community in which the malpractice allegedly occurred. In *Dekker v. Magic Valley Regional Medical Center*, 115 Idaho 332, 766 P.2d 1213 (1988), the affidavits of plaintiff's out-of-state experts did not demonstrate any knowledge of the standard of care in the community. We upheld the trial court's granting of defendant's summary judgment motion on the ground that § 6–1013 requires actual knowledge of the standard of care in the community where the alleged malpractice occurred. *Id.* at 334, 766 P.2d at 1215. In *Gubler v. Boe*, 120 Idaho 294, 815 P.2d 1034 (1991), the trial court excluded the testimony of plaintiff's expert because he had not familiarized himself with the community standard of care (that of Pocatello). Instead, he had spoken only with a doctor practicing in Idaho Falls. We upheld the district court's decision, noting that the expert had not familiarized himself with the local standard in Pocatello as required by § 6–1012, a statute which is site-specific. *Id.* at 296, 815 P.2d at 1036. Non-local experts may, of course, familiarize themselves with the local standard of care by speaking with doctors practicing in the community in which the malpractice allegedly occurred. *See, e.g., Dunlap ex rel. Dunlap v. Garner*, 127 Idaho 599, 606, 903 P.2d 1296, 1303 (1994); *Watts v. Lynn*, 125 Idaho 341, 345, 870 P.2d 1300, 1304 (1994); *Kozlowski v. Rush*, 121 Idaho 825, 827–30, 828 P.2d 854, 856–59 (1992).

The only case in which we have addressed the issue of when a plaintiff may establish the community standard of care by reference to *similar* communities within Idaho is *Hoene v. Barnes*, 121 Idaho 752, 828 P.2d 315 (1992). In that case, we considered the portion of § 6–1012 at issue in the instant case: "If there be no other like provider in the community and the standard of practice is therefore indeterminable, evidence of such

standard in similar Idaho communities at said time may be considered." The district court in *Hoene* granted defendant's motion for summary judgment on the ground that plaintiff's expert did not have actual knowledge of the relevant community standard as required by §§ 6–1012 and –1013. At the time of plaintiff's surgery, however, defendant was one of only six cardiovascular surgeons in Idaho, all of whom practiced together in Boise as a professional association. We noted that, under the "unique circumstances" of the case, no provider of the medical services at issue existed within Idaho other than the defendant and his associates. *Id.* at 754, 828 P.2d at 317. Because they practiced together as "one business entity," they were one "provider" under § 6–1012. *Id.*, 828 P.2d at 317. Thus, we concluded that the community standard of care pursuant to § 6–1012 was indeterminable. *Id.*, 828 P.2d at 317. We then turned to similar communities within Idaho, as provided by § 6–1012. *Id.*, 828 P.2d at 317. Because of the unique facts of the case, however, no similar communities existed within Idaho and §§ 6–1012 and –1013 did not apply. *Id.*, 828 P.2d at 317. We finally concluded that we had to consider the case law preceding the enactment of these statutes. *Id.*, 828 P.2d at 317.

In the case at bar, Morris argues that a situation similar to that in *Hoene* has occurred. Morris argues that doctors practicing in the Emmett community at the relevant time were either unavailable or biased in favor of Thomson and thus that Morris' expert, Dr. Giles, could properly testify regarding the standard of care in communities similar to Emmett. Morris, however, has ignored the central premise of our decision in *Hoene.* In that case, the plaintiff first demonstrated that no health care provider other than the defendant or his business associates practiced in the local community (Boise) and thus that the local standard of care was indeterminable. Only then did we turn to "similar communities" to establish the relevant standard of care. Under § 6–1012, Morris cannot establish the local standard of care by reference to similar communities until she has demonstrated that the standard of care in Emmett was indeterminable due to the absence of other health care providers in the community. In this case, however, Morris has failed to establish that no other health care provider was practicing in Emmett at the time of Jessie's birth through which her expert could have familiarized himself with the local standard of care. Because she did not demonstrate that the standard of care in Emmett was indeterminable, Morris could not use the standard of care in similar communities.

The district court thus properly instructed the jury regarding the standard of care in this case. First, the language of the instruction mirrors the language of I.C. § 6–1012 which this Court has approved as a correct explanation of the law. Second, the portion of the instruction limiting the consideration of the standard of care in similar communities to situations in which the local standard within the community is indeterminable was correct. Not only does it repeat the language of § 6–1012, but it also comports with the case law interpreting this section.

## IV.

## CONCLUSION

We hold that the trial court did not err in: (1) refusing to automatically dismiss for cause all potential jurors having a doctor-patient relationship with defendant Dr. Thomson, (2) refusing to dismiss for cause Juror Hill, (3) refusing to allow Morris to question Dr. Watkins regarding prior statements the witness made concerning her opinion as to the timing of Jessie's injuries, (4) striking that portion of Dr. Giles' testimony that referred to the standard of care requiring the use of a fetal scalp monitor, and (5) instructing the jury regarding the standard of care in medical malpractice cases. Furthermore, we hold that no error occurred when defense counsel spoke with Jessie's former treating physicians outside the course of formal discovery. Costs on appeal to respondent.

JOHNSON and McDEVITT, JJ., concur.

SILAK, J., concurs in parts I, II, III. A, B, C, E, F, and IV, and concurs in the result in part III. D.

**148**

SCHROEDER, Justice, specially concurring.

I concur in the result but caution that the Court's opinion in III. A. not be read broadly. The Court comments that, "[t]he doctor-patient relationship, however, does not create a clear risk of prejudice." Emphasis should be placed on the opposing concern. The doctor-patient relationship creates a serious risk of prejudice, and the determination of whether the patient should remain on the jury panel should be approached with extreme caution.

In most instances if there is actually a current doctor-patient relationship the juror will be disqualified for cause under I.R.C.P. 47(h)(3) as a debtor of the doctor. Ironically, most people are probably more concerned with retaining goodwill with their doctor than with a creditor. The doctor upon whom a prospective juror is dependent for on-going medical treatment of what may be intimate details of health is likely more important in the juror's life than the creditor who can be paid. Regardless, the doctor-patient relationship is not one of the bases for a challenge under I.R.C.P. 47(h). The district court approached the issue properly under existing law. The point remains, however, that this Court's ruling should be read cautiously.

Examination of the juror runs several risks. First, the doctor may have dealt with intimate, personal details of the juror's life. The juror may be hesitant to share a frank opinion under these circumstances. Additionally, examination of the juror runs the risk of constituting a sworn testimonial on behalf of the doctor that can influence other members of the panel. Extreme caution should be taken in limiting the type of examination of the juror that takes place in front of other jurors lest the entire panel be tainted.

Because the doctor-patient relationship is not enumerated as a basis for a challenge for cause in I.R.C.P. 47(h), and because the district court developed an appropriate record, I concur in the result, though I caution care in such cases.

937 P.2d 1222

Robynne L. McKAY, a single person; and Co–Ad, Inc., as guardian ad litem for Daniel Wayne McKay Butler, a minor and disabled person, Plaintiffs–Appellants,

v.

R. Bruce OWENS and Jane Doe Owens, husband and wife, and the marital community composed thereof, Howard & Owens, P.A., an Idaho professional services corporation; Howard L. Manweiler and Jane Doe Manweiler, husband and wife, and the marital community composed thereof, and Manweiler, Bevis & Cameron, P.A., an Idaho professional services corporation, Defendants–Respondents.

No. 22134.

Supreme Court of Idaho,
Boise, December 1996 Term.

May 20, 1997.

William F. Lee, Boise; and Robert B. Gould argued, Seattle, WA, for the appellant.

Evans Keane, L.L.P., Boise, for respondent Manweiler. William McCurdy argued.

Cosho, Humphrey, Greener & Welsh, Boise, for respondent Owens. Steven B. Price argued.

SILAK, Justice.

This is a legal malpractice case, stemming from an underlying medical malpractice action. In the medical malpractice suit, Henry E. Houst, Jr. (Houst) and respondent R. Bruce Owens (Owens) represented the interests of appellant Robynne L. McKay (McKay) and her disabled son Daniel, while respondent Howard Manweiler (Manweiler) was appointed by the court to act as guardian ad litem (guardian) for Daniel. McKay was separately represented at the minor's compromise hearing by Allen Ellis (Ellis), and James Baugh (Baugh) acted as an additional guardian for a trust to be set up for Daniel. Neither Houst nor Baugh is a party to this action.

The medical malpractice action settled, and after all parties agreed to it at the minor's compromise hearing, the court approved the settlement. McKay subsequently filed a legal malpractice action against Manweiler and Owens (collectively referred to as the Respondents). This appeal follows the district court's granting of summary judgment in favor of the Respondents, and the court's subsequent decision to grant sanctions, attorney fees, and costs against McKay and Ellis.

## I.

### FACTS AND PROCEDURAL BACKGROUND

In 1987, McKay gave birth to Daniel by emergency caesarean section. Daniel has been severely disabled since birth, and in 1989, McKay filed a medical malpractice action on behalf of herself and Daniel against St. Luke's Regional Medical Center (St. Luke's) and her obstetrician. Her attorneys at that time were Houst and Owens. That same year, Manweiler was asked to be guardian ad litem for Daniel, although he was not appointed by the court until the minor's compromise hearing in 1992.

McKay alleges that Owens and Manweiler agreed to settle the case without her approval and over her repeated objections. She states that she felt that there was nothing she could do to reject the settlement after Owens and Manweiler accepted it, although the minor's compromise hearing had not yet been held and Houst told her she did not have to accept anything she did not want to. After becoming dissatisfied with Owens' representation, McKay retained Ellis to represent her interests in the medical malpractice action. She alleges that she attempted to find new counsel to take the medical malpractice action to trial, but that no one would represent her because of Owens' lien rights on attorney fees, and because the new counsel would have to split the attorney fees with Owens in some fashion.

Before the minor's compromise hearing, McKay filed objections to, among other things, the proposed compromise, and to Manweiler's appointment as guardian. McKay contends that she never withdrew two of her objections to the settlement. One of those objections was that she never agreed to the settlement. However, as discussed below, she clearly agreed to the settlement at the minor's compromise hearing. The second objection, which McKay also contends was never withdrawn, was stated as follows: "As presently postured, Robynne McKay objects to the settlement which is proposed. However, if the attorney fees and other matters are clarified, she will reluctantly consent to the settlement." The transcript from the

minor's compromise hearing reflects that not only did McKay and Ellis agree to the settlement at the hearing, but that they specifically withdrew their objection to the attorney fees, as well as the other objections McKay made. Finally, neither she nor Ellis objected to Houst's statement that "all concerns presented by Robin [sic] McKay, pursuant to her objection filed by Mr. Allen Ellis, have been resolved."

After Ellis made his statement withdrawing the objections, the magistrate court asked: "[w]ith that, then, Mr. Ellis, you're saying you agree with the recitation of what the settlement is and *you are recommending that for your client?*" (emphasis added). Ellis responded "[y]es, Your Honor" [with the stipulation that money to be paid to McKay in 1997 and 2002 was in settlement of her personal injury claim]. Later, the Court again asked:

> THE COURT: Now, Mr. Ellis, I'm sure that you have looked at this a lot longer than I have, and you're satisfied that it's a fair resolution, and you want this for your client?
>
> MR. ELLIS: That is correct, Your Honor.
>
> THE COURT: Okay. And, Ms. McKay, now, this is complex. I'm sure you've spent a lot more time on it than I have, obviously, too. And you talked to your lawyers at the counsel table, and your lawyer, Mr. Ellis. So do you feel that you have a good understanding of it, and approval of it?
>
> MS. ROBIN [sic] MCKAY: Yes.
>
> THE COURT: And is there anything you want to say?
>
> MS. ROBIN [sic] MCKAY: Not (indiscernible).

McKay alleges that despite the preceding dialogue with the court, she agreed to the settlement only after she was unable to find other representation, and then only to "mitigate her damages." She also alleges that she never was truly satisfied with the settlement, and argues that she never really agreed to it.

In an affidavit in the record, Ellis stated that "I advised plaintiff Robynne McKay to withdraw her objection to the proposed mi-

nor's compromise in order to mitigate her damages as required by law prior to her bring [sic] malpractice and breach of fiduciary duty claims." Therefore, Ellis advised McKay to tell the court she approved the settlement, even though she now alleges that she never truly agreed to the settlement. McKay also stated in an affidavit that:

> After discussions with Mr. Ellis, and cognizant of my duty to mitigate damages, I agreed to withdraw my objections to the Minor's Compromise such that Daniel would receive as much as possible from the defendant hospital St. Luke's and the defendant doctor. . . .

At the minor's compromise hearing, in response to direct questions from the magistrate judge, Houst, Owens, Manweiler and Baugh gave their consent to the settlement. The magistrate court in the minor's compromise hearing then approved the settlement. McKay, Manweiler, Owens, Houst, and Ellis signed a "Release of All Claims and Indemnity Agreement." This release was signed after the minor's compromise hearing, and therefore was not before the magistrate judge. While that agreement specifically released St. Luke's and the obstetrician from further liability, it specifically preserved any claims McKay might have had against Owens. On appeal, no one disputes that the release did not bar any legal malpractice claims McKay might have.

In 1994, McKay's new attorneys, Robert Gould (Gould) and William Lee (Lee), filed a legal malpractice complaint against Owens and Manweiler. The complaint alleged negligence in representing a client, willful disobedience of a client's instructions, and failure to exercise discretion in good faith. Essentially, the complaint was that Owens and Manweiler settled the medical malpractice claim without McKay's consent, and that the amount of the settlement was insufficient. Manweiler filed a motion to dismiss under I.R.C.P. 12(b)(6), which the trial court denied, and alternatively a motion for summary judgment under I.R.C.P. 56. The trial court granted summary judgment based on the doctrines of judicial estoppel and quasi-judicial immunity. Owens also filed a motion to dismiss, which the trial court treated as a motion for summary judgment and granted on the basis of the doctrine of judicial estoppel.

Manweiler and Owens then filed motions for sanctions under I.R.C.P. 11, as well as attorneys' fees and costs. The court awarded costs as a matter of right under I.R.C.P. 54(d)(1), although it denied discretionary costs. In addition, the court required McKay's counsel to pay Owens' and Manweiler's attorney fees and computer research costs as a sanction under I.R.C.P. 11. McKay appeals.

## II.

### ISSUES ON APPEAL

The issues on appeal are:

1. Whether the trial court erred in granting Owens' motion to dismiss and Manweiler's motion for summary judgment based on the doctrine of judicial estoppel.

2. Whether the trial court erred in granting Manweiler's motion for summary judgment based on the doctrine of quasi-judicial immunity.

3. Whether the trial court erred in granting Owens' and Manweiler's motions for attorneys' fees, costs, and sanctions.

## III.

### STANDARD OF REVIEW

This appeal follows the district court's decision granting Manweiler's motion for summary judgment and Owens' motion to dismiss for failure to state a claim upon which relief can be granted. However, because the court considered matters outside the pleadings, such as affidavits and the record from the minor's compromise hearing, it properly treated Owens' motion as one for summary judgment. I.R.C.P. 12(b) provides that:

> [i]f, on a motion asserting the defense . . . to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment. . . .

When the Supreme Court reviews a district court's decision on summary judgment, it employs the same standard as that properly employed by the trial court when originally ruling on the motion. *Thomson v. Idaho Ins. Agency, Inc.,* 126 Idaho 527, 529, 887 P.2d 1034, 1036 (1994). Summary judgment is proper "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." I.R.C.P. 56(c). Finally, this Court liberally construes all disputed facts in favor of the non-moving party, and will draw all reasonable inferences and conclusions supported by the record in favor of the party opposing the motion. 126 Idaho at 529, 887 P.2d at 1036.

## IV.

## ANALYSIS

### A. The Trial Court Did Not Err In Granting The Motions For Summary Judgment Based On The Doctrine Of Judicial Estoppel.

The district court granted the summary judgment motions based on the doctrine of judicial estoppel. McKay argues that she should not be judicially estopped, because she had to accept the settlement in order to "mitigate her damages," and because under the circumstances she had no other choice.

This Court has previously considered and adopted the doctrine of judicial estoppel. *Loomis v. Church,* 76 Idaho 87, 277 P.2d 561 (1954). In *Loomis,* the plaintiff-appellant sued the driver of a car in which she had been a passenger, alleging the driver caused an accident with a truck by failing to stop at a stop sign. However, the plaintiff had previously recovered from the truck owner, after stating that the car's driver *had stopped* at the stop sign. The Court held that the plaintiff could not recover from the car's driver, and set forth the doctrine of judicial estoppel:

> It is quite generally held that where a litigant, by means of such sworn statements, obtains a judgment, advantage or consideration from one party, he will not thereafter, by repudiating such allegations

and by means of inconsistent and contrary allegations or testimony, be permitted to obtain a recovery or a right against another party, arising out of the same transaction or subject matter.

*Id.* at 93–94, 277 P.2d at 565 (citations omitted). *See also Saint Alphonsus Reg'l. Med. Ctr. v. Bannon,* 128 Idaho 41, 44, 910 P.2d 155, 158 (1995) (stating that the position asserted in the later action must be contrary); *Middlekauff v. Lake Cascade, Inc.,* 110 Idaho 909, 915, 719 P.2d 1169, 1175 (1986) (reiterating that the plaintiff must have obtained a judgment, advantage, or consideration from a party in the earlier proceeding).

The Ninth Circuit has applied the doctrine of judicial estoppel, and recently stated the doctrine and the policies behind it:

> Judicial estoppel, sometimes also known as the doctrine of preclusion of inconsistent positions, precludes a party from gaining an advantage by taking one position, and then seeking a second advantage by taking an incompatible position ...

*Rissetto v. Plumbers and Steamfitters Local 343,* 94 F.3d 597, 600 (9th Cir.1996). There are also important policies behind judicial estoppel. In *Rissetto,* the Ninth Circuit stated that:

> The policies underlying preclusion of inconsistent positions are general considerations of the orderly administration of justice and regard for the dignity of judicial proceedings.... Judicial estoppel is intended to protect against a litigant playing fast and loose with the courts ... Because it is intended to protect the dignity of the judicial process, it is an equitable doctrine invoked by a court at its discretion.

*Id.* at 601 (quoting *Russell v. Rolfs,* 893 F.2d 1033, 1037 (9th Cir.1990), *cert. denied,* 501 U.S. 1260, 111 S.Ct. 2915, 115 L.Ed.2d 1078 (1991)).

While we have not previously considered judicial estoppel in the context of legal malpractice, appellate courts of other states have done so. In *Brown v. Small,* 251 Mont. 414, 825 P.2d 1209 (1992), Brown accepted a settlement from an insurance company, after which his attorneys discovered a mid-term endorsement giving additional coverage.

Brown's attorneys then negotiated a larger settlement, principally on the basis that the insurance company had hidden the endorsement in bad faith. Brown accepted the settlement, then sued the attorneys, alleging that they were negligent in not finding the endorsement sooner.

The Supreme Court of Montana held that Brown's legal malpractice claim was barred by judicial estoppel, noting that "[t]he rule's purpose is to suppress fraud and prevent abuse of the judicial process *by deliberate shifting of positions to suit the exigencies of a particular action.* ..." *Id.* at 1212 (emphasis in original) (citations omitted). The court also held that:

> The doctrine applies with additional force here because Brown's allegation in the second complaint against the insurer resulted in a net recovery by him of almost $75,000. After accepting the benefits of that allegation, Brown cannot now change his position and allege that negligence by Small and Doubek was the real reason they did not discover the mid-term endorsement sooner.

*Id.*

In *Owen v. Knop,* 853 S.W.2d 638 (Tex. App.1993), the court considered a legal malpractice action arising from a medical malpractice suit. In the underlying action, Owen alleged that she did not know nor could she have known of the doctor's negligence until she received a correct diagnosis from another doctor. After that case settled, Owen filed a legal malpractice action, alleging that her attorney negligently failed to file the medical malpractice suit in a timely manner and otherwise "preserve her claim for damages." *Id.* at 640. (Owen contended that she received a smaller settlement because there was a possible statute of limitations defense). The court noted that judicial estoppel does not operate if the prior statements were "made inadvertently due to mistake, fraud, or duress," but "[o]ne may not assert a position contrary to that alleged or admitted under oath in a former proceeding." *Id.* at 641.

In *Owen,* as in the case at bar, the plaintiff claimed that she had to take inconsistent positions due to her attorney's malpractice.

In response to that argument, the court stated:

> This contention is without merit. The rationale underlying the theory of judicial estoppel is the preservation of the sanctity of the oath and the elimination of prejudice in the administration of justice. One may not assert a particular position in order to serve one purpose, then assert a wholly contrary position to serve another. This Owen improperly attempted to do, and she cannot be allowed to assert that the purported malfeasance of her own attorney made her do it.

*Id.* at 643.

In *Winmark v. Miles & Stockbridge,* 109 Md.App. 149, 674 A.2d 73 (1996), the appellant had failed to list its possible legal malpractice claim against the respondents on the personal property schedule in a bankruptcy action. The court found that the legal malpractice claim was barred by judicial estoppel, and admonished that:

> If parties in court were permitted to assume inconsistent positions in the trial of their causes, the usefulness of courts of justice would in most cases be paralyzed; the coercive process of the law, available only between those who consented to its exercise, could be set at naught by all. But the rights of all men, honest and dishonest, are in the keeping of the courts, and consistency of proceeding is therefore required of all those who come or are brought before them. It may accordingly be laid down as a broad proposition that one who, without mistake induced by the opposite party, has taken a particular position deliberately in the course of litigation, must act consistently with it; one cannot play fast and loose.

*Id.* 674 A.2d at 79–80 (quoting *Kramer v. Globe Brewing Co.,* 175 Md. 461, 2 A.2d 634 (1938)).

■ The elements of judicial estoppel have been met in this case. McKay, as the litigant, stated in court that she agreed to the settlement. Ellis admits that he encouraged her to agree in court to the settlement, and he himself stated in court that he concurred with the settlement. Moreover, McKay and

Ellis specifically withdrew previously filed objections to the settlement. McKay filed objections to the settlement on the following bases:

1. Owens entered into the settlement without McKay's consent and failed to provide her with information regarding the case;

2. Manweiler approved the settlement without McKay's consent;

3. McKay objected to the settlement as proposed, but also stated that "if the attorney fees and other matters are clarified ... [I would] reluctantly consent to the settlement";

4. Houst and Owens did not have standing to bring the petition since neither was Daniel's parent;

5 . Manweiler had never been appointed guardian ad litem and had never consulted with McKay regarding the litigation; and

6. No part of the settlement proceeds had been allocated to McKay, contrary to her instructions.

McKay also registered concerns, although not specific objections, about the lack of a present value amount, a contingent fee agreement, statement of hours and services rendered by the attorneys, and a breakdown of costs in the settlement agreement. McKay also requested $25,000 to be paid on July 1, 1995, to compensate her for the lack of consent, and requested a reduction in attorney fees.

At the minor's compromise hearing, McKay specifically waived her objections on the standing issue, Manweiler's appointment as guardian ad litem, the cost breakdown, the attorney fees, the present value calculation, and McKay's share of the settlement. McKay concedes in her opening brief on appeal that "[o]n the record in open court, Robynne and Ellis both withdrew their written objection to the Minor's Compromise hearing and approved the settlement with the underlying health care professionals." To the contrary, in her reply brief, she argues that she never withdrew her objections regarding the fair value of the settlement and the unauthorized settlement. However, the portions of the transcript from the minor's compromise hearing, quoted in Section I of this opinion, clearly reflect that McKay and Ellis agreed to the settlement, without reserving any objections. The magistrate gave Ellis and McKay the opportunity to raise new and continuing objections, and they did not. Instead, they both clearly registered their agreement to the settlement. Therefore, we hold that McKay withdrew her objections to the minor's compromise. This becomes important because the very bases for McKay's legal malpractice claim were waived as objections: that Owens and Manweiler settled the medical malpractice claim without McKay's consent, and that the damages awarded pursuant to the settlement agreement were insufficient.

By taking the position of agreeing to the settlement, McKay obtained an advantage (the settlement) from one party (the medical malpractice defendant). She cannot now repudiate that statement made in open court in front of a judge, and by means of her inconsistent positions, obtain a recovery against another party, arising out of the same transaction. While Owens and Manweiler were not parties to the medical malpractice action, as attorneys in the case, they were so intimately intertwined with the medical malpractice proceedings that this legal malpractice action can be termed to be "arising out of the same transaction."

McKay asserts that she never really meant to approve the settlement, and that she always intended to file this legal malpractice action. Judicial estoppel, with its attendant policies, is tailor-made to prevent just such a tactic, and to block the "secret or subjective intent" of the litigant. The sanctity of court proceedings is something that cannot be trifled with, nor will we permit a party to play fast and loose with the courts. To allow McKay's argument that Owens' and Manweiler's alleged malpractice "forced" her to lie in court, desecrates the sanctity of court proceedings, and impedes the administration of justice. In order to properly carry out its duties in approving a minor's compromise, a court must be fully informed of the nature and status of the agreements. To mislead the court by stating that one agrees to a

settlement when one does not, adversely affects the court's ability to discharge its duties, and impedes the administration of justice. The concept of "telling the truth" in such an important matter must be imputed to Daniel's mother and attorney Allen Ellis. Hence Daniel, via his mother McKay, basically held the "trump card" to this proposed settlement. Everyone involved changed their positions based upon McKay's and Ellis's intentionally false and misleading statements. Therefore, we hold that McKay's claims in this case against Manweiler and Owens are barred by the doctrine of judicial estoppel.

McKay cites several cases for the proposition that a legal malpractice action may be brought after settlement of the underlying case. However, none of those cases involved judicial estoppel, and in each, the alleged malpractice was not discovered until after the settlement had been approved. Therefore, the cases are distinguishable. *See Malfabon v. Garcia*, 111 Nev. 793, 898 P.2d 107 (1995); *Grayson v. Wofsey, Rosen, Kweskin & Kuriansky*, 231 Conn. 168, 646 A.2d 195 (1994); *Barr v. Day*, 124 Wash.2d 318, 879 P.2d 912 (1994).

█ This decision does not mean that attorneys will never be accountable for their negligence whenever there has been a settlement in the underlying transaction. If a client does not learn of the grounds for, or facts giving rise to, legal malpractice until after the settlement has been approved, the policies behind judicial estoppel will not be furthered, and the doctrine should not be employed. For guidance purposes and to avoid misapplication of judicial estoppel, it should be made clear that the concept should only be applied when the party maintaining the inconsistent position either did have, or was chargeable with, full knowledge of the attendant facts prior to adopting the initial position. Stated another way, the concept of judicial estoppel takes into account not only what a party states under oath in open court, but also what that party knew, or should have known, at the time the original position was adopted. Thus, the knowledge that the party possesses, or should have possessed, at the time the statement is made is determina-

tive as to whether that person is "playing fast and loose" with the court.

The situation would also be different, for example, if an attorney committed malpractice by neglecting to include a defendant in the complaint. In that case, assuming that the client was not aware of the malpractice before agreeing to the settlement, the client may have a legal malpractice claim. The conduct giving rise to the legal malpractice claim, while potentially affecting the amount of the final settlement agreement, is not part and parcel of the settlement agreement. The client could still agree to the settlement while retaining the right to file a legal malpractice action.

In contrast, McKay's legal malpractice claim goes to the heart of the settlement itself: that Owen and Manweiler settled the case without her consent, and that the settlement amount is insufficient. The case could not be "settled," as a matter of law, without the compromise of the minor's claim being approved by the court. As discussed previously, McKay assented to the settlement without reservation or objection, and now is complaining about the very conduct she clearly approved at the minor's compromise hearing.

The argument might also be made that *Loomis* is distinguishable because in that case, the contrasting representations were clearly factual. In this case, McKay's representations were arguably legal as opposed to factual. However, judicial estoppel is designed to preclude inconsistent *positions*. At the minor's compromise hearing, McKay took the position that she agreed to the settlement. Now, she is taking the position that she did *not* agree to the settlement. Judicial estoppel is meant to prevent taking inconsistent positions, whether legal or factual, at least absent newly discovered evidence or fraud. In addition, McKay's assent to the settlement was, at least in part, a factual representation that she did in fact agree to the settlement. Therefore, *Loomis* may not be distinguishable.

McKay could have registered her continuing objection to the settlement, and the court would not have approved it. Idaho Code section 15–5–409a clearly states, "before the

compromise shall be valid or of any effect the same shall be approved by the court of the county where the minor resides...." The magistrate judge recognized that fact when she stated, after Owens had noted two matters to be clarified:

"Well, I'll note your exceptions, but it seems to me this is the sort of thing that you should have resolved before you come into court here right now. And then I don't know that I can make a determination if you don't agree on this thing ... I think you either have a settlement or you don't.

McKay had many avenues open to her, none of which she chose to pursue. Where, as here, the client knows of the claim for legal malpractice before settlement occurs, but deceives the court by accepting the settlement, he or she will not be permitted to benefit from that deception. Accordingly, we affirm the district court's application of judicial estoppel in this case.

**B. In Performing His Duties As Guardian Ad Litem Pursuant To Idaho Code Section 5–306, Manweiler Was Acting As An Arm Of The Court And Is Therefore Protected By The Doctrine Of Quasi–Judicial Immunity.**

Manweiler also argues that because a guardian ad litem acting under I.C. § 5–306 is an arm of the court, the guardian should be granted quasi-judicial immunity status. We have not previously considered this question in Idaho, but we note that the "arm of the court" analysis stems from an analysis employed by the United States Supreme Court. That Court stated that it has "applied a 'functional approach'... which looks to 'the nature of the function performed, not the identity of the actor who performed it.'" *Buckley v. Fitzsimmons*, 509 U.S. 259, 269, 113 S.Ct. 2606, 2613, 125 L.Ed.2d 209 (1993) (citations omitted). Therefore, the question becomes whether a guardian ad litem, acting under I.C. § 5–306, is functioning as an arm of the court.

The district court found that:

The guardian ad litem in *Barr [v. Day*, 124 Wash.2d 318, 879 P.2d 912 (1994)] per-

formed the same functions that Mr. Manweiler performed in the underlying case here. The Washington court specifically held that 'guardians ad litem in guardianship proceedings involving court approval of settlements of civil claims of incompetents act as an arm of the court, and are therefore entitled to quasi-judicial immunity from civil liability.' *Id.* 879 P.2d at 919.

Applying the analysis of *Barr,* the district court determined that the doctrine of quasi-judicial immunity applied in this case.

Federal jurisdictions have considered the quasi-judicial immunity issue as well, generally in the context of a custody dispute. The First, Eighth, and Sixth Circuits have extended absolute immunity to guardians involved in custody disputes and investigations of sexual abuse. *Cok v. Cosentino*, 876 F.2d 1, 3 (1st Cir.1989); *Myers v. Morris*, 810 F.2d 1437, 1467 (8th Cir.1987) (holding that "[t]he absolute immunity which is accorded persons acting as an integral part of the judicial process protects them from having to litigate the manner in which they performed their delegated functions."); *Kurzawa v. Mueller*, 732 F.2d 1456, 1458 (6th Cir.1984).

Several states have extended immunity to guardians in custody battles. Missouri noted that "at least in custody matters, the guardian ad litem has traditionally been viewed as functioning as an agent or arm of the court, to which it owes its principal duty of allegiance, and not strictly as legal counsel to a child client." *State ex rel. Bird v. Weinstock*, 864 S.W.2d 376, 384 (Mo.App. 1993). Further, the court found it important that the court is not bound by the guardian's recommendation. *Id.* at 385. *See also Delcourt v. Silverman*, 919 S.W.2d 777, 785 (Tex.App.1996) (holding that a guardian in a custody battle was entitled to judicial immunity, because the guardian's duty was to make impartial recommendations to the court). Several courts have also noted that if the guardian is compensated from the ward's resources, it makes it more likely that he is functioning in a manner similar to a private attorney. *Delcourt*, 919 S.W.2d at 786.

We are mindful that a rule by which guardian ad litem immunity under I.C. § 5–306 is determined on a case-by-case basis could lead to second-guessing, a hindsight analysis, and a chilling effect on the willingness of qualified individuals to serve as guardians. Therefore, while we will employ the functional analysis advocated by the United States Supreme Court, we will also avoid rules which would permit immunity to turn on the often fine-line distinctions between being an advocate or being a functionary of the court.

I.C. § 5–306, under which Manweiler was appointed, provides that:

> When an infant or an insane or incompetent person is a party, he must appear either by his general guardian or by a guardian ad litem appointed by the court in which the action is pending in each case, or by a judge thereof, or a probate judge. A guardian ad litem may be appointed in any case when it is deemed by the court in which the action or proceeding is prosecuted, or by a judge thereof, expedient, to represent the infant, insane or incompetent person in the action or proceeding, notwithstanding he may have a general guardian and may have appeared by him.

Although I.C. § 5–306 states that the guardian is appointed to "represent" the infant, insane or incompetent person, that term is ambiguous. It may mean "in place of," or it may mean "on behalf of." *See State ex rel Bird,* 864 S.W.2d at 385. Therefore, the fact that "represent" appears in the statute is not dispositive.

In its summary judgment decision in the legal malpractice action, the district court stated that Manweiler acted as a guardian prior to his actual appointment, and was appointed *nunc pro tunc* at the minor's compromise hearing. That would militate against Manweiler being an arm of the court. In addition, Manweiler was ultimately paid from the proceeds of the settlement. However, there are also facts which show that he was acting as an arm of the court.

Using the functional analysis employed by the United States Supreme Court, the guardian's duty under I.C. § 5–306 is to consider all of the alternatives and give its recommen-dation to the Court based on what will be best for the ward. Therefore, the guardian can be seen as an "agent of the court." *See Short by Oosterhous v. Short,* 730 F.Supp. 1037, 1038 (D.Colo.1990) (discussing guardians in the child custody context). That function was amply illustrated in this case. Manweiler told the court that he thought that the settlement, as previously outlined, was fair to Daniel, particularly given the uncertainties of the case.

It is also important to note that Daniel's interests were represented by two attorneys: Henry Houst and Bruce Owens. If the settlement was not satisfactory, it was the duty of Houst and Owens to inform the court, and advocate a different position for Daniel. Manweiler's duty was to examine the settlement and facts of the case for the court and act as advisor to and as an arm of the court.

■ Although I.C. § 5–306 itself, and the proceedings below, do not provide a clear-cut answer to the issue, the policies behind quasi-judicial immunity lead us to the conclusion that guardians under I.C. § 5–306 should be given absolute quasi-judicial immunity. The Minnesota Supreme Court noted that although a guardian may even act as an advocate to some degree, quasi-judicial immunity is not inappropriate. Specifically, that court held that:

> A guardian ad litem is an officer of the court. The guardian's duty is to act within the course of that judicial proceeding in furtherance of the best interests of the child for whom the guardian has been appointed. A guardian must be free, in furtherance of the goal for which the appointment was made, to engage in a vigorous and autonomous representation of the child. Immunity is necessary to avoid harassment from disgruntled parents who may take issue with any or all of the guardian's actions.

*Tindell v. Rogosheske,* 428 N.W.2d 386, 387 (Minn.1988) (citations omitted). Similarly, although written in the context of a custody dispute, the United States District Court for the District of Colorado stated that:

> [t]o safeguard the best interests of the children, [ ], the guardian's judgment must

158

remain impartial, unaltered by the intimidating wrath and litigious penchant of disgruntled parents. Fear of liability ... can warp judgment that is crucial to vigilant loyalty for what is best for the child; the guardian's focus must not be diverted to appeasement of antagonistic parents. *Short,* 730 F.Supp. at 1039. Further, qualified attorneys might be unwilling to represent a child if "disgruntled or vituperative parents could hold the guardian ad litem personally responsible." *Delcourt,* 919 S.W.2d at 785.

█ That policy applies to guardians acting under I.C. § 5–306, who are appointed to represent the child. The guardian must act in the best interest of the child, not the parents. This case well illustrates the principle. Manweiler testified that, based upon his experience and after reviewing the settlement information, the compromise was in Daniel's best interests. It is absolutely essential that guardians are free to make such a determination, without fear that a parent, seeking a larger award or settlement amount, will later sue the guardian for legal malpractice. Therefore, we hold that guardians ad litem, appointed under I.C. § 5–306, operate under the cloak of absolute quasi-judicial immunity.

We note, however, that granting quasi-judicial immunity to a guardian does not leave the parties without recourse. The attorney-guardian is still subject to the Idaho Rules of Professional Conduct. Further, a court may remove the guardian if he or she is not performing his or her duties, and may also reject the guardian's recommendations. In addition, the parents may certainly take a position contrary to that of a guardian, and may seek appeal of an adverse position. McKay was well within her rights when she objected to Manweiler's appointment prior to the compromise hearing, and could have sustained that objection at the hearing. Finally, she could have maintained her objection to the settlement, as could her attorney. *See State ex rel. Bird,* 864 S.W.2d at 386. However, she did not exercise any of those options, and cannot now sue Manweiler, who is protected by absolute quasi-judicial immunity.

### C. The Trial Court Did Not Err In Awarding Costs As A Matter Of Right Under I.R.C.P. 54(d)(1) And Attorney Fees As A Sanction Under I.R.C.P. 11.

McKay argues that the trial court's award of attorney fees under I.R.C.P. 54(e)(1) and I.C. § 12–121 should be reversed. However, the court did not award attorney fees under those provisions. Instead, it awarded attorney fees and computer-aided research costs as a sanction under I.R.C.P. 11. In so doing, the district court stated:

> Before filing the First Amended Complaint, Plaintiffs' counsel had available to them, if they did not in fact possess, the transcript of the minor's compromise hearing and the pleadings of that action which included the written objection to the settlement, filed by Attorney Ellis, and the affidavit of Ms. McKay. By designating Attorney Ellis an expert in this action and by submitting an affidavit from him admitting he advised Ms. McKay to misrepresent herself to the Magistrate, Plaintiffs' counsel demonstrate they were aware of Attorney Ellis' misrepresentations, endorsed them and relied on them in pursuing this action. Such conduct is not reasonable under the circumstances and warrants Rule 11 sanctions.

█ We review an imposition of I.R.C.P. 11 sanctions for abuse of discretion. *Sun Valley Shopping Ctr., Inc. v. Idaho Power Co.,* 119 Idaho 87, 94, 803 P.2d 993, 1000 (1991). I.R.C.P. 11 states that if an attorney signs a pleading, motion or other paper, the signature certifies that "to the best of the signer's knowledge, information, and belief after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument" for a change in the law.

█ In this case, Lee and Gould had Ellis' affidavit in which he admitted that he "advised plaintiff Robynne McKay to withdraw her objection to the proposed minor's compromise in order to mitigate her damages as required by law prior to her bring [sic] malpractice and breach of fiduciary duty claims." Similarly, McKay admitted in an affidavit

that she withdrew her objections "such that Daniel would receive as much as possible from the defendant hospital St. Luke's and the defendant doctor...." Even in the face of those admissions by both Ellis and McKay that they deliberately misled the magistrate judge in the minor's compromise hearing, Lee and Gould still filed the legal malpractice action, on the basis that McKay never really agreed to the settlement.

Such a case, based upon deliberate misstatements to a court of law, is not well grounded in fact or law, and the trial court's imposition of attorney fees and computer-aided research costs as a sanction under I.R.C.P. 11 was not an abuse of discretion.

McKay also argues that the award of discretionary costs should be reversed. However, the trial court awarded no discretionary costs. The only costs awarded were costs as a matter of right as the prevailing party under I.R.C.P. 54(d)(1). Since McKay does not appeal the imposition of those costs, we affirm that decision of the trial court.

**D. Owens And Manweiler Are Entitled To Their Costs And Attorney Fees On Appeal.**

█ Manweiler requests attorney fees on appeal pursuant to I.A.R. 41 and I.R.C.P. 11, while Owens requests attorney fees under I.A.R. 41, I.R.C.P. 11, and I.C. § 12–121, and costs under I.A.R. 40. Because this case was brought based upon deliberate misstatements to a court of law by both the litigant and her counsel acting in concert, we are left with the "abiding belief that the appeal has been brought or defended frivolously, unreasonably, or without foundation." *Durrant v.*

*Christensen*, 117 Idaho 70, 74, 785 P.2d 634, 638 (1990). Therefore, pursuant to I.A.R. 41, we award attorney fees to the Respondents on appeal. Further, we award the Respondents their costs on appeal as the prevailing party under I.A.R. 40.

**V.**

**CONCLUSION**

Attorney Allen Ellis not only condoned but encouraged Robynne McKay to deliberately lie to and deceive the magistrate court about McKay's approval of the minor's compromise. Because McKay stated under oath that she was in agreement with the settlement, she is judicially estopped from now stating the directly opposite proposition. Further, Howard Manweiler, as a guardian ad litem acting under I.C. § 5–306, was acting as advisor to and arm of the court, and is therefore granted absolute quasi-judicial immunity.

In addition, we uphold the I.R.C.P. 11 sanctions and award of costs as a matter of right, and award costs and attorney fees to Manweiler and Owens on appeal.

JOHNSON and SCHROEDER, JJ., and WOOD, J. Pro Tem, concur.

McDEVITT, J., concurs in the result.

938 P.2d 187

**STATE of Idaho, Plaintiff–Respondent,**

v.

**Clarence FERGUSON, Defendant–
Appellant.**

No. 22768.

Supreme Court of Idaho.

May 27, 1997.

John M. Adams, Kootenai County Public Defender; J. Bradford Chapman, Deputy Kootenai County Public Defender, Coeur d'Alene, for appellant.

Alan G. Lance, Attorney General; Myrna A.I. Stahman, Deputy Attorney General, Boise, for respondent.

SILAK, Justice.

In April 1991, after appellant Clarence Ferguson (Ferguson) pled guilty to a felony charge of aiding and abetting an aggravated battery pursuant to I.C. §§ 18–903(a) and 18–907(a), he was sentenced to a unified term of seven years with two years fixed. The district court suspended the sentence and placed Ferguson on probation for five years and ordered that he serve sixty days in the Kootenai County Jail.

On January 17, 1995, the district court revoked Ferguson's probation having found that Ferguson violated said probation on three separate occasions in 1994. The court reimposed Ferguson's previous sentence, but retained jurisdiction for 180 days pursuant to I.C. § 19–2601.

In June 1995, after Ferguson successfully completed the retained jurisdiction program, the district court again placed him on probation. However, a probation violation occurred in July 1995, and at the dispositionary hearing on December 28, 1995, the district court revoked Ferguson's probation and reimposed the prison sentence, stating: "[A]nd I think the only choice I have under the facts of this particular case is to go ahead and revoke the probation and impose the prison sentence that is imposed." The court modified Ferguson's previous sentence to a unified term of five years with two years fixed, and Ferguson was given credit for time served. The district court's written order issued on December 29, 1995, erroneously stated that the court retained jurisdiction over Ferguson's sentence pursuant to I.C. § 19–2601. The court issued a corrected order on January 24, 1996, stating that it was not retaining jurisdiction. Ferguson filed a notice of appeal on February 21, 1996.

On appeal, Ferguson argues that the district court abused its discretion by imposing sentence and imprisoning Ferguson. The State argues that Ferguson's appeal is untimely and therefore should be dismissed. We agree that Ferguson's appeal is untimely.

Idaho Appellate Rule 14 provides that an appeal as a matter of right must be filed with the clerk of the district court within 42 days from the entry of the judgment or order from which the appeal is taken. This rule further provides:

In a criminal case, the time to file an appeal is enlarged by the length of time the district court actually retains jurisdiction, up to one hundred and twenty (120)

days and an extension up to an additional sixty (60) days pursuant to Section 19–2601(4) Idaho Code.

The district court's order revoking Ferguson's probation the second time was issued on December 29, 1995. The court issued its corrected order on January 24, 1996, and Ferguson filed his notice of appeal on February 21, 1996. The State argues that pursuant to I.A.R. 14, Ferguson must have filed his appeal within 42 days of the issuance of the December 29, 1995 order which would have been February 9, 1996. The State argues that even though the court's original order stated that the court retained jurisdiction, the court did not actually retain jurisdiction and therefore the time to file an appeal was not enlarged under I.A.R. 14.

We hold that Ferguson had 42 to days to file his notice of appeal from the entry of the December 29, 1995 order. The time was not enlarged by the erroneous statement that the court was retaining jurisdiction because the district court did not have the authority to retain jurisdiction a second time. In *State v. Travis*, 125 Idaho 1, 867 P.2d 234 (1994), the trial court sentenced Travis to an indeterminate term of ten years for lewd conduct, but retained jurisdiction for 180 days to allow for an evaluation of Travis. At the conclusion of the retained jurisdiction period, the court suspended the balance of Travis's sentence and placed him on probation. Five years later, the district court found that Travis had violated his probation, revoked the probation and reduced Travis's sentence to an indeterminate term of five years. The court stated that it retained jurisdiction for 120 days. 125 Idaho at 2–3, 867 P.2d at 235–36. On appeal, this Court held that the district court had no authority to retain jurisdiction the second time:

> Pursuant to I.C. § 19–2601(4), in sentencing a defendant to the custody of the board of correction, a trial court may retain jurisdiction. During the period of retained jurisdiction, the trial court may exercise the retained jurisdiction to suspend the execution of judgment and place the defendant on probation. This procedure may be used, however, only during the first 120 or 180 days of a sentence ... In retaining jurisdiction a second time the trial court exceeded its authority under I.C. § 19–2601(4).

*Id.* at 7, 867 P.2d at 240. *See also State v. Maggard*, 126 Idaho 477, 479, 886 P.2d 782, 784 (Ct.App.1994)("It is settled that after the court initially has retained jurisdiction over a defendant and then places the defendant on probation, if the defendant later is found to have violated the terms of his or her probation, the court cannot once again validly retain jurisdiction ...").

In the present case, the first time the district court retained jurisdiction was in its January 17, 1995 order revoking probation and reinstating Ferguson's original sentence. The court retained jurisdiction for 180 days, and on June 9, 1995, the court placed Ferguson back on probation. Thus, on December 29, 1995, when the district court again revoked Ferguson's probation, it had no authority to retain jurisdiction for a second time as this was well beyond the first 180 days of the sentence. It is therefore irrelevant whether the December 29, 1995 order erroneously stated the court was retaining jurisdiction or not. Further, the district court correctly stated to Ferguson at the December 28, 1995 dispositionary hearing that Ferguson's probation was revoked and that his prison sentence was being imposed. Thus, Ferguson's notice of appeal, filed on February 21, 1996, was more than 42 days from the entry of the order from which he attempted to appeal. The appeal is therefore untimely and is dismissed.

JOHNSON and McDEVITT, JJ., concur.

SCHROEDER, Justice, dissenting.

I respectfully dissent. Idaho Criminal Rule 54.3(a) provides that the time for filing an appeal begins to run "from the date evidenced by the filing stamp of the clerk of the court on the judgment, order or decree appealed." The time does not run from the oral pronouncement of the court. When the sentencing court issued its order revoking probation on December 29, 1995, the written order specified that the court retained jurisdiction. There was no reason for Ferguson to appeal that order. The fact that the order

was incorrect should not be held against Ferguson in counting time for the appeal. The order said what it said. The Board of Correction would have been obliged to follow the order, and Ferguson had a right to expect that the order would be followed. The confusion between the oral comments of the court and the written order should be resolved in favor of Ferguson by virtue of I.C.R. 54.3(a).

A written order reflecting the actual sentence was not filed until January 24, 1996. In effect Ferguson did not receive the type of notice required by Rule 54.3(a) to commence the time for appeal until the corrected order was filed. The time for appeal should be counted from that date.

The consequences of failure to file a timely appeal are harsh. To justify that harshness the rules governing the time for filing must be clear. I.C.R. 54.3(a) is clear. The defendant should not have the burden of determining that the order was invalid and appeal when there is no reason to appeal the order as written. Only when the corrected order was entered did Ferguson have a reason to appeal.

The Court should not hold the district court's error against Ferguson. His appeal should be heard.

TROUT, C.J., concurs in dissent.

938 P.2d 189

**Fred QUINTO, Plaintiff–Appellant,**

v.

**MILLWOOD FOREST PRODUCTS, INC., Defendant–Respondent.**

No. 21778.

Court of Appeals of Idaho.

April 3, 1997.

Petition for Review Denied, June 19, 1997.

Malcolm S. Dymkoski, Coeur d'Alene, for plaintiff–appellant.

Jarold P. Cartwright, Coeur d'Alene, for defendant–respondent.

LANSING, Judge.

This is an action for alleged misdelivery of cedar lumber. The appeal is taken from an order of the district court granting a directed verdict to the defendant. We reverse.

## FACTS AND PROCEDURAL BACKGROUND

In September 1989, Appellant Fred Quinto acquired from Petersen Forest Products, LTD, (Petersen), two truck loads of rough cedar lumber. He arranged for Petersen to deliver the lumber to Respondent Millwood Forest Products, Inc. (Millwood), where it was to be milled into siding. After Millwood milled the cedar lumber to specifications provided by Quinto, at Quinto's instruction a portion of the wood was loaded onto trucks for delivery to Petersen and another portion was delivered to a customer of Quinto's. The remaining wood was milled a second time at Quinto's request in an attempt to enhance its quality and value. After this lumber had been remilled and Millwood had been paid, the wood remained in Millwood's yard. In January 1990, and again in March 1990, Millwood requested that Quinto remove the lumber. During March 1990, Quinto telephoned to inform Millwood that a Davis Transport Company truck would pick up the wood during the week of March 25. On Monday, March 25, a truck of Point to Point Trucking, Ltd. arrived at the yard, and the driver told Millwood employees that he was to pick up the Quinto lumber. This truck was sent not by Quinto but by Petersen, who was apparently engaged in a dispute with Quinto regarding the right to the lumber or its proceeds. The lumber was loaded onto the Point to Point truck by Millwood employees and was transported to Petersen. On Wednesday, March 27, when Quinto telephoned to tell Millwood that the Davis Transport truck would arrive that day, he learned that the lumber had been delivered to Petersen.

Quinto brought this suit against Millwood seeking damages for the value of the lumber released to Petersen. At the conclusion of the presentation of evidence at trial, the district court granted Millwood's motion for a directed verdict. In granting the motion, the court concluded that the storage of the

lumber on Millwood's premises after milling benefitted only Quinto and, therefore, constituted a gratuitous bailment. The court reasoned that, as a gratuitous bailee, Millwood could be liable only for gross negligence, and not for simple negligence, in caring for the lumber. Because the court found that the evidence would not support a finding of gross negligence on the part of Millwood, a directed verdict was granted in Millwood's favor. Quinto now appeals, contending that Millwood was a bailee for hire and was therefore liable for simple negligence in handling property entrusted to its custody, that a claim of breach of contract between Millwood and Quinto was raised in the pleadings or tried by consent of the parties and should have been presented to the jury, and that the district court improperly admitted hearsay evidence at trial.

## ANALYSIS

### A. Liability for Misdelivery of Bailed Goods

■■■■ We consider first the trial court's order directing a verdict for Millwood on the basis that a gratuitous bailee is not liable for simple negligence. On a motion for a directed verdict pursuant to I.R.C.P. 50(a), the moving party necessarily admits the truth of the adverse evidence and every inference that may legitimately be drawn therefrom in the light most favorable to the opposing party. *Stephens v. Stearns*, 106 Idaho 249, 252–53, 678 P.2d 41, 44–45 (1984); *Jordan v. Hunter*, 124 Idaho 899, 904, 865 P.2d 990, 995 (Ct.App.1993). The moving party is entitled to a directed verdict only if the evidence yields but one conclusion as to the verdict that reasonable minds could reach. *Stephens, supra*. In reviewing the decision to grant a motion for a directed verdict, the appellate court applies the same standard utilized by the trial court. *Quick v. Crane*, 111 Idaho 759, 764, 727 P.2d 1187, 1192 (1986); *Stephens, supra*. Because the question whether a directed verdict is appropriate is an issue of law, we freely review the trial court's decision. *Id.*

The district court grappled with the issue of the standard of care applicable to Millwood in the circumstances presented here.

In initially granting Millwood's motion for a directed verdict, the court noted that Millwood's processing of the lumber was completed by October or November of 1989, and it was anticipated by the parties that the lumber would be retrieved by Quinto shortly after milling. The court found that there had been no agreement between the parties for storage of the lumber until March 1990, and that Millwood had neither charged nor received any fee for this storage. The court concluded that the storage of the lumber on Millwood's premises after the milling therefore constituted a gratuitous bailment. Relying upon the general rule that a gratuitous bailee is liable for loss or damage to bailed goods only if the injury was caused by the bailee's gross negligence, *see* Annotation, *Duty and Liability of Gratuitous Bailee or Mandatory*, 4 A.L.R. 1196 (1919), the court held that the evidence was insufficient to demonstrate gross negligence by Millwood, and therefore directed a verdict in Millwood's favor.

Quinto then moved for a new trial, alleging, *inter alia*, that the court had erred in holding that Millwood was a gratuitous bailee. Quinto asserted that a bailment for hire existed and that Millwood was therefore required to exercise ordinary care with respect to the bailed goods. Upon consideration of Quinto's motion, the district court revised its determination as to the law applicable to a gratuitous bailee and held that misdelivery of goods by a gratuitous bailee, however innocent, imposes absolute liability upon the bailee. The court relied upon numerous authorities for this proposition, including RESTATEMENT (SECOND) OF TORTS § 234 (1965); 8 AM.JUR.2d. *Bailments* § 181, at 911–12 (1980); 8 C.J.S. *Bailments* § 92, at 334 (1988); Samuel Williston, WILLISTON ON CONTRACTS (1936). Accordingly, the court ordered a new trial. Thereafter, both parties requested revision of the district court's decision, and the court ultimately reinstated the directed verdict in Millwood's favor. The court was persuaded that in Idaho, the rule of absolute liability for misdelivery of bailed goods was abrogated by *Loomis v. Imperial Motors Inc.*, 88 Idaho 74, 396 P.2d 467 (1964). The court

interpreted *Loomis* as holding that liability of a gratuitous bailee for misdelivery arises only upon a showing of gross negligence.

On appeal, Quinto again argues that Millwood was a bailee for hire. We, however, conclude that the characterization of the bailment as gratuitous or for hire is irrelevant to disposition of Quinto's claim and that the district court was correct in its second disposition of this case because a bailee is liable for unauthorized delivery regardless of the level of care that may have been exercised by the bailee.

▇▇▇ A bailment is:

A delivery of goods or personal property, by one person to another, in trust for the execution of a special object upon or in relation to such goods, beneficial either to the bailor or bailee or both, and upon a contract, express or implied, to perform the trust and carry out such object, and thereupon either to redeliver the goods to the bailor or otherwise dispose of the same in conformity with the purpose of the trust.

*Id.* at 78, 396 P.2d at 469, quoting BLACK'S LAW DICTIONARY (4th ed.). A gratuitous bailment is a bailment for the sole benefit of the bailor. *Id.* A gratuitous bailee is liable for *damage to or loss of* the bailed item only if the bailee was grossly negligent. *Id.* at 79, 396 P.2d at 469–70. A bailee for hire, on the other hand is liable for simple negligence (the failure to use ordinary or reasonable care) which results in the *loss of or damage to* bailed property. *Low v. Park Price Co.,* 95 Idaho 91, 94, 503 P.2d 291, 294 (1972) (loss of furniture from house that was in the custody of a house mover); *Carson v. Bye,* 79 Idaho 495, 498, 321 P.2d 604, 605 (1958) (loss of transmission from a car in garage for repairs).

▇▇▇ The nature of the bailment relationship is of little or no consequence, however, to the question of liability for *misdelivery* of bailed goods. The great weight of authorities hold that a delivery of bailed property by a bailee to one not authorized by the bailor to receive it is a conversion or a breach of the bailment contract for which the law imposes liability on the bailee irrespective of negligence. RESTATEMENT (SECOND) OF TORTS § 234; Walter H.E. Jaeger, WILLISTON ON CONTRACTS § 1038 (3d ed. 1967); W. Page Keeton et al., PROSSER AND KEETON ON THE LAW OF TORTS § 15, at 97 (5th ed. 1984). "This liability is the same whether the bailment is for the sole benefit of the bailor, the sole benefit of the bailee, or the mutual benefit of both." 8 Am.Jur.2d *Bailments* § 181, at 912.

For example, in *Rensch v. Riddle's Diamonds of Rapid City, Inc.,* 393 N.W.2d 269 (S.D.1986), two diamond rings were left with a jeweler to be cleaned, the cleaning having been advertised as free to the public. When the owner returned to pick up his rings, he learned that the jeweler's clerk had mistakenly given the rings to another customer. The rings were never recovered. The Supreme Court of South Dakota, relying on the general rule that even innocent misdelivery of bailed goods by a gratuitous bailee imposes absolute liability on the bailee, affirmed a summary judgment against the bailee on the issue of liability.

In *Fireman's Fund Ins. Co. v. Wagner Fur, Inc.,* 760 F.Supp. 1101 (S.D.N.Y.1991), a fur storage facility delivered, via UPS, the owner's furs to the wrong address, from which they subsequently vanished. The court reversed a summary judgment entered in the bailee's favor, citing the common law rule that "any of the usual types of bailee" who delivers bailed goods to the wrong person is liable to his bailor. *Id.* at 1105 & n. 10.

Similarly, in *Byer v. Canadian Bank of Commerce,* 8 Cal.2d 297, 65 P.2d 67 (1937), the court rejected an argument by the defendant bank that, being a gratuitous bailee of bonds deposited for safekeeping, it was liable only for gross negligence when an imposter secured the bonds by means of a forged telegram. The Supreme Court of California, held that misdelivery of bailed goods imposes liability upon the bailee even where the bailee acted innocently and by mistake. *See also Jacobson v. Richards & Hassen Enterprises,* 172 F.2d 464 (2d Cir.1949) (coat check concessionaire who misdelivered a coat to impostors was liable to the bailor even on the assumption that there existed only a gratuitous bailment); *Wabco Trade Co. v. S.S.*

*Inger Skou,* 482 F.Supp. 444, 448 (S.D.N.Y. 1979) (absence of benefit to bailee does not preclude liability for misdelivery); *S/M Industries, Inc. v. Hapag–Lloyd, A.G.,* 586 So.2d 876 (Ala.1991) (unauthorized delivery of furniture by warehouse was a conversion and "neither a sincere or apparently well-founded belief that the delivery to an unauthorized person was right nor the exercise of any degree of care constitutes a defense even to a gratuitous bailee."); *Harlan State Bank v. Banner Fork Coal Corp.,* 202 Ky. 639, 261 S.W. 16 (1924) (duty to return property to owner is absolute); *Baer v. Slater,* 261 Mass. 153, 158 N.E. 328 (1927) (delivery to unauthorized person gives rise to liability even if bailment is gratuitous); *Marlow v. Conway Iron Works,* 130 S.C. 256, 125 S.E. 569 (1924) (misdelivery of ginned cotton gives rise to liability irrespective of negligence); *Central Meat Market v. Longwell's Transfer, Inc.,* 62 S.W.2d 87 (Tex. Comm'n App.1933) (misdelivery of stored automobile renders bailee liable without regard to the question of due care or degree of negligence). *But see Maitlen v. Hazen,* 9 Wash.2d 113, 113 P.2d 1008 (1941) (applied gross negligence analysis in misdelivery case).

We do not believe that *Loomis v. Imperial Motors, Inc., supra,* adopts a principle in Idaho that differs from this nearly universal rule of liability for misdelivery of goods by a bailee. In *Loomis,* an automobile dealership sold a vehicle to a minor who, twenty days later, disaffirmed the contract and offered to return the vehicle. This offer was refused by the dealer. Shortly after his twenty-first birthday, the purchaser brought an action, apparently for recovery of the purchase price. The Supreme Court held that upon the purchaser's disaffirmance, the sale became void, so that the purchaser was entitled to restitution of the price paid. The Court next considered the dealer's claim that it was entitled to collect compensation for the reasonable rental value of the vehicle while it was in the purchaser's possession. The Court held that the dealer was not entitled to such compensation. In conducting its analysis, the Supreme Court characterized the purchaser as a bailee following his disaffirmance of the contract, and the Court commented that, "The liability of a gratuitous bailee or a bailee under a bailment for the sole benefit of the bailor is generally recognized as one arising for gross negligence." *Loomis,* 88 Idaho at 79, 396 P.2d at 469–70. This statement in *Loomis* is dicta inasmuch as there was no claim against the purchaser for negligence. Indeed, the Supreme Court seemed to acknowledge that the above comment was dicta when it stated in the next paragraph of the opinion: "The ultimate question in this case does not depend upon the loss of the bailed goods or upon any injury arising from the bailment. The ultimate question arises out of a claim for compensation by the bailor for the use of the goods bailed...." *Id.* Moreover, the Supreme Court also recognized that the rule that a gratuitous bailee is liable only for gross negligence has reference "only in situations of damage to the bailed goods or loss of those goods while operating within the limits of the bailment." *Id.*

Hence, *Loomis* does not establish a rule in Idaho governing liability of a bailee for misdelivery of goods. We reach this conclusion both because the language in *Loomis* addressing the liability of a gratuitous bailee is dicta and because, even if taken at face value, it applies only to liability for damage to or loss of goods, not to misdelivery.

In the absence of controlling Idaho authority, we deem it appropriate to follow the widely-accepted rule that bailees, whether gratuitous or not, will be liable for delivery of bailed goods to an unauthorized person. Consequently, we hold that the directed verdict against Quinto was erroneously granted and that a new trial is necessary.

**B. Adequacy of the Complaint to State a Breach of Contract Claim**

In the course of granting the directed verdict in favor of Millwood, the district court indicated that a breach of contract claim was neither sufficiently pleaded in Quinto's complaint, nor proved by the evidence. For guidance on remand, we will address the adequacy of Quinto's pleading, but in light of the necessity for a new trial, we do not address the sufficiency of the evidence.

"Modern pleading as reflected by I.R.C.P. 8(a)(1) requires only a simple, concise and direct statement fairly apprising the defendants of claims and grounds upon which the claims rest." *Myers v. A.O. Smith Harvestore Products, Inc.,* 114 Idaho 432, 439, 757 P.2d 695, 702 (Ct.App.1988). *See also Whitehouse v. Lange,* 128 Idaho 129, 133, 910 P.2d 801, 805 (Ct.App.1996). There is no requirement that a complaint include a statement of the various legal theories upon which the plaintiff relies. *Bauer v. Minidoka School Dist. No. 331,* 116 Idaho 586, 589, 778 P.2d 336, 339 (1989); *Collord v. Cooley,* 92 Idaho 789, 793, 451 P.2d 535, 539 (1969). The purpose of a complaint is to inform the defendant of the material facts upon which the plaintiff rests the action. *Clark v. Olsen,* 110 Idaho 323, 325, 715 P.2d 993, 995 (1986); *Whitehouse,* 128 Idaho at 133, 910 P.2d at 805.

We conclude that Quinto's complaint is sufficient to state a claim for breach of contract. The complaint alleges that Quinto delivered rough lumber to Millwood with instructions that Millwood was to process the lumber into siding, that Millwood did process the wood as directed by Quinto, that Quinto paid Millwood "the agreed price," that Quinto instructed Millwood to load the lumber onto a Davis Transport Company truck and that, notwithstanding these instructions, Millwood loaded the siding onto a truck of Point to Point Trucking, with the consequence that the siding has been lost to Quinto. Millwood did not move for a more definite statement of the claim prior to trial, as was its option under I.R.C.P. 12(e), and there is no indication that Millwood complained that it lacked sufficient notice that Quinto was pursuing a breach of contract claim. In our view, the allegations of Quinto's complaint fairly apprise Millwood of a cause of action for breach of contract.

## C. Admission of Hearsay under Rule 804(b)(3)

Quinto also contests the admissibility of certain evidence that was allowed at trial. Because the issue may emerge again at a new trial on remand, we will address this evidentiary question.

The trial court admitted, over Quinto's objection, two documents ostensibly prepared by Petersen. The first was a copy of a purchase order dated January 24, 1990, indicating that Petersen was purchasing 17,000 board feet of lumber from Quinto. This copy, which was sent to Millwood by Petersen, was received by Millwood on the day after the lumber was delivered to Petersen. The second document was a letter dated April 11, 1990, from Petersen's president, Hubert Petersen, to Millwood stating that Quinto had authorized Petersen to sell the lumber in January, and that Petersen was following this instruction and had credited Quinto's account for the lumber at a price above market value. No representative of Petersen testified at the trial. The trial court admitted the documents under I.R.E. 804(b)(3), the hearsay exception for statements against the declarant's pecuniary or proprietary interest.

Hearsay evidence is not admissible except as provided by the Idaho Rules of Evidence or other court rules. I.R.E. 802. The foundation for this general rule of hearsay exclusion is the principle that testimonial assertions should be subjected to the test of cross-examination. *Isaacson v. Obendorf,* 99 Idaho 304, 309, 581 P.2d 350, 355 (1978). The trial court has discretion to admit or exclude hearsay under the many exceptions to the general rule that hearsay is inadmissible. *Dep't. of Health and Welfare v. Altman,* 122 Idaho 1004, 1007, 842 P.2d 683, 686 (1992); *Cheney v. Palos Verdes Inv. Corp.,* 104 Idaho 897, 900, 665 P.2d 661, 664 (1983).

The hearsay exception under which the Petersen purchase order and letter were admitted provides in relevant part:

. . . .

The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

. . . .

(3) Statement against interest. A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject declarant to civil or criminal liability, or to render invalid a claim by declar-

ant against another, that a reasonable man in declarant's position would not have made the statement unless declarant believed it to be true.

I.R.E. 804(b)(3). The rationale of this exception is that "a man will not make a damaging statement against himself unless it is true." Report of Idaho State Bar Evidence Committee, C 804, at 21 (Supp. Dec. 31, 1984) (hereinafter Evidence Committee Report). "Under the theory that people do not lightly make statements that are damaging to their interests, [this] requirement provides the safeguard of special trustworthiness justifying most of the exceptions to the hearsay rule." Kenneth S. Broun et al., McCORMICK ON EVIDENCE § 316, at 335, 336 (4th ed. 1992).

Rule 804(b)(3) requires that the statement be so decidedly against the declarant's interest "that a reasonable man in declarant's position would not have made the statement unless declarant believed it to be true." Even if the statement seems to be against the declarant's interest in some respect, if it appears that the declarant had some motive of self-interest when the statement was made which was likely to lead to misrepresentation of the facts, the statement should be excluded. *Id.*, § 319 at 348. As the Evidence Committee Report explains,

> Another aspect of the "reasonable man" test is whether the declarant believed the statement was against his interest. If not, the rationale for the exception fails. Weinstein points out 'it is not the fact that the declaration is against interest but the awareness of the fact by the declarant which gives the statement significance.'...

Evidence Committee Report, *supra*, citing 4 J. Weinstein & M. Berger, WEINSTEIN'S EVIDENCE § 804(b)(3)[02], at 97 (Supp. 1983).

■ In admitting the letter and purchase order at issue here, the trial court concluded that they were statements against Petersen's interest because their assertion that Petersen had agreed to pay Quinto above market price for the lumber, and had credited Quinto's account for such price, obligated Petersen to credit Quinto's account as indicated and would subject Petersen to liability if it

subsequently asserted a contrary position. We conclude, however, that in the circumstances presented here, the statements in the documents were not clearly against Petersen's interest and, to the contrary, were likely self-serving and may have been designed to enhance Petersen's position in any subsequent litigation with Quinto or Millwood over the unauthorized lumber delivery. Both documents were received by Millwood after the processed lumber had been delivered to Petersen. The thrust of these communiques was that the wood had been properly reclaimed by Petersen per an earlier agreement with Quinto and that Petersen had properly credited Quinto's account with the amount due. A reasonable person in the position of Hubert Petersen might well believe that it was in his interest to assert to Millwood in writing a post-hoc justification for taking possession of the lumber. At the time these statements were communicated to Millwood, Hubert Petersen may not have considered them to be against his interest but instead intended that they would enhance Petersen's position in any controversy with Millwood or Quinto over entitlement to the lumber. Under the circumstances presented here, the statements were as likely to be self-serving as they were to be against the author's pecuniary interest. Consequently, the statements lack the indicia of trustworthiness on which the Rule 804(b)(3) hearsay exception is based. We hold that Rule 804(b)(3) was not applicable to the Petersen purchase order and letter. We do not, of course, offer any opinion as to the admissibility of this evidence under any other hearsay exception that might be invoked in the retrial of this action.

## ATTORNEY FEES

Quinto requests an award of attorney fees incurred on appeal pursuant to I.C. § 12–120(3). That statute provides that the prevailing party will be entitled to reasonable attorney fees incurred in a civil action arising from a commercial transaction. Because we are remanding the case for a new trial, it has not yet been determined whether Quinto will be the ultimate prevailing party in this litigation. Therefore, we do not award attorney

fees but hold that attorney fees incurred for this appeal may be taken into account by the trial court in determining the amount of fees which ultimately should be awarded to the prevailing party at the conclusion of the litigation.

### CONCLUSION

The district court's order granting a directed verdict to respondent Millwood Forest Products, Inc., is reversed and this case is remanded to the district court for further proceedings consistent with this opinion. Costs are awarded to appellant pursuant to I.A.R. 40.

WALTERS, C.J., and PERRY, J., concur.

938 P.2d 1209

Ron J. GABRIEL and Marilyn Gabriel,
husband and wife, Plaintiffs–
Appellants,

v.

Deloyd CAZIER, Jr., and Mary E. Cazier,
husband and wife, Defendants–
Respondents.

No. 22876.

Supreme Court of Idaho.
Boise, February 1997 Term.

April 4, 1997.

Rehearing Denied June 30, 1997.

Churchill Law Offices, Boise, for appellants. Gary L. Neal argued.

Salladay, Harrigfeld & Day, Boise, for respondents. G. Lance Salladay argued.

JOHNSON, Justice.

This is a restrictive covenant case. We conclude that the covenant prohibiting a business in a subdivision is ambiguous in the context of the covenant, and that it should not be construed to prohibit swimming lessons conducted by a homeowner's children

for profit during the summer months. We also conclude that there is substantial and competent evidence to support the trial court's finding that conducting the swimming lessons did not constitute a nuisance.

## I.

### THE BACKGROUND AND PRIOR PROCEEDINGS

The Caziers and the Gabriels live across the street from each other in a subdivision (the subdivision). A declaration of protective restrictions and covenants (the declaration) applies to the subdivision. Under the title "NUISANCES," the declaration provides:

No business or trade or offensive or noxious activity shall be carried on upon any lot in the Subdivision, nor shall anything be done thereon which may become an annoyance or a nuisance to the neighborhood by unreasonably interfering with the use and enjoyment of other property within the Subdivision, nor shall any residence be utilized for public purposes or services including public worship or church services. Weeds shall be kept cut and portions of any lot not in use for lawn or otherwise shall be kept trimmed and in a neat and orderly condition.

Another portion of the declaration provides that "toilet facilities shall be located inside the dwelling ... and shall be connected ... with ... a septic tank...."

The Caziers' children taught swimming lessons at their backyard pool in the subdivision during the summer months from 1988 through 1995. Each summer, they conducted eighteen lessons four or five days a week for ten weeks, earning approximately $10,000. These lessons resulted in a substantial increase in traffic and parking in the neighborhood. The Caziers maintained a portable chemical toilet outside their home near the swimming pool for the convenience of the swimming students.

The Gabriels sued the Caziers, alleging that the Caziers violated the declaration by operating a business within the subdivision and by creating a nuisance and annoyance that unreasonably interfered with the Gabriels' use and enjoyment of their property. The Gabriels sought a permanent injunction against the swimming lessons, general damages, together with reasonable attorney fees and costs. In addition, the Gabriels sought to have the portable chemical toilet removed.

Following a court trial, the trial court found:

1. at least two other families in the subdivision conduct swimming lessons at their pools;

2. the Caziers' do not employ anyone outside the family for the lessons;

3. the Gabriels are the only residents of the subdivision that have a complaint about the Caziers' swimming lessons;

4. the increase in traffic is well within the capacity of the streets in the subdivision;

5. the parking does not constitute a disturbance to the Gabriels;

6. the swimming lessons are not unduly noisy or disturbing to neighbors;

7. the Gabriels conduct part of their real estate business from their home, have operated a mail-order business from their home, have raised farm animals in their backyard, and have sold these animals.

The trial court ruled that the Caziers' activity is not a "business" as used in the declaration because it is an occasional or seasonal activity, and that the declaration has been interpreted by those in the subdivision to allow swimming lessons for at least fifteen years without complaint. Therefore, the trial court concluded that the declaration has been abandoned as it applies to swimming lessons offered by a homeowner's children during a limited period of time. The trial court also ruled that the lessons are not a nuisance, but that the portable chemical toilet violates the declaration. The trial court awarded the Caziers judgment, except it said the Caziers

shall not use a portable chemical toilet in connection with the swimming lessons. The Gabriels appealed.

## II.

**THE TERM "BUSINESS," IN THE CONTEXT OF THE DECLARATION, IS AMBIGUOUS, AND THERE IS SUBSTANTIAL AND COMPETENT EVIDENCE TO SUPPORT THE TRIAL COURT'S FINDING THAT THE SWIMMING LESSONS ARE NOT A BUSINESS.**

■■■■ The Gabriels assert that the swimming lessons were a "business" prohibited by the declaration. We conclude that, in the context of the declaration, the term "business" is ambiguous, and that there is substantial and competent evidence to support the trial court's finding that the swimming lessons are not a business. We first address the ambiguity of the term "business" in the context of the declaration. In order to determine whether a provision of a restrictive covenant is ambiguous, we must determine whether the provision is reasonably susceptible to conflicting interpretations. *Brown v. Perkins*, 129 Idaho 189, 193, 923 P.2d 434, 438 (1996).

The declaration states that "no business or trade or offensive or noxious activity shall be carried on upon any lot in the Subdivision." "Business" can be reasonably interpreted to include the swimming lessons at issue in this case, as well as other activities, including home offices. "Business" can also reasonably be interpreted to include only permanent commercial enterprises like shops, restaurants, and office buildings. Therefore, we conclude that, in the context of the declaration, the term "business" is ambiguous, requiring construction.

If a restrictive covenant is subject to conflicting interpretation, it is ambiguous, and its construction is a question of fact to be interpreted according to the following principles:

If an ambiguity is found in the restrictive covenant, the Court is to determine the intent of the parties at the time the instrument was drafted. The interpretation of the restrictive covenants intended by the drafters can be ascertained from the language of the covenants, the existing circumstances at the time of the formulation of the covenants, and the conduct of the parties. Additionally, the mutual interpretation of the restrictive covenants afford cogent evidence of their meaning. *Brown* at 193, 923 P.2d at 438 (citations omitted).

We are also constrained in our interpretation by the principle that "When 'construing a restrictive covenant, which is in derogation of the common law right to use land, restrictions are not to be extended by implication to include any restrictions not expressed clearly and doubts are to be resolved in favor of the free use of land.'" *Id.* at 192, 923 P.2d at 437 (quoting *Post v. Murphy*, 125 Idaho 473, 475, 873 P.2d 118, 120 (1994)).

The trial court heard evidence by the writer of the declaration who stated that the prohibition on businesses was intended to prohibit activities such as opening automobile repair shops and animal kennels. In addition, the trial court found that at least two other families in the subdivision conduct swimming lessons from their backyard pools. One family has conducted lessons for over fifteen years. The trial court also found that with the exception of the Gabriels, no other resident of the subdivision has registered any complaints about the lessons. This evidence supports the finding that the term "business" as used in the declaration was not intended nor interpreted by the owners of lots in the subdivision to prohibit swimming lessons conducted by a homeowner's children in their own backyard during a limited time in the summer.

## III.

**THERE IS SUBSTANTIAL AND COMPETENT EVIDENCE TO SUPPORT THE TRIAL COURT'S FINDING THAT CONDUCTING THE SWIMMING LESSONS IS NOT A NUISANCE.**

■■■■ The Gabriels assert that the trial court should not have found that conducting

the swimming lessons is not a nuisance prohibited in the declaration. We conclude that there is substantial and competent evidence to support the trial court's finding.

The trial court found that the Caziers' activity does not constitute a nuisance or interfere with the rights of the Gabriels. The trial court based this finding on the fact that the lessons do not create an undue amount of noise, they are conducted in the Caziers' backyard, they are during reasonable hours of the day, the parking is confined to the Cazier's own frontage, and the increased traffic is within the capacity of the subdivision's streets.

## IV.

## CONCLUSION

We affirm the judgment of the trial court.

We award the Caziers costs, but not attorney fees, on appeal.

TROUT, C.J., McDEVITT, J., and WOODLAND, J. Pro Tem., concur.

SCHROEDER, J., concurs in the result.

SCHROEDER, Justice, concurring.

I concur in the result but do so on the basis that it is clear, as the district court determined, that the declaration of restrictions has been abandoned as it applies to swimming lessons of the type conducted by the respondent's children. The Court's decision goes too far in using evidence of conduct within the neighborhood to interpret the meaning of the restriction. That evidence clearly establishes abandonment but should not be used to say that this commercial activity is not a business. If this activity had been challenged shortly after the subdivision was developed it would seem almost certain that there would be a finding that this was a business. However, the neighborhood has abandoned objection to this commercial activity. Even those who now object have conducted business on their property.

938 P.2d 1212

Glenn C. **BOTHWELL** and Glida Bothwell, husband and wife; Dave Croniola and Martha Croniola, husband and wife; Michael S. Decker and Peggy J. Decker, husband and wife; Gabe Holmquist and Peggy J. Holmquist, husband and wife; Amy J. Holmquist; Warren H. Keller; Betty C. Langley; Barry L. Pharoah and C. Wylene Pharoah, husband and wife; and Frank W. Stoppello and Vicki M. Stoppello, husband and wife, Petitioners–Appellants,

v.

The **CITY OF EAGLE** and Eagle City Council; and Jayo Construction, Inc., Respondents.

No. 23041.

Supreme Court of Idaho.
Boise, April 1997 Term.

May 28, 1997.

Jim Jones & Associates, Boise, for petitioners–appellants. John C. McCreedy argued.

Eberle, Berlin, Kading, Turnbow & McKlveen, Boise, for respondent Jayo Construction. Stephen A. Bradbury argued.

JOHNSON, Justice.

This is a land use planning case in which a city council granted approval of a preliminary subdivision plat. We conclude that this approval is lacking in finality and is therefore not subject to judicial review.

## I.

### THE BACKGROUND AND PRIOR PROCEEDINGS

Jayo Construction (Jayo) submitted to the city of Eagle applications for approval of a preliminary subdivision plat (the preliminary plat application) and for a floodplain development permit (the floodplain permit application). The Eagle city council (the council) approved the preliminary plat application, but did not approve or deny the floodplain permit application. The council included in its approval of the preliminary plat application conditions that Jayo must fulfill before approval of a final subdivision plat and floodplain permit and stated that there "will be a review before final plat approval in a public hearing format."

Some property owners in Eagle (collectively referred to as Bothwell) petitioned the district court for judicial review of the council's approval of the preliminary plat application. The district court affirmed the council's approval. Bothwell appealed.

## II.

### THE COUNCIL'S APPROVAL OF THE PRELIMINARY PLAT IS NOT A FINAL DECISION THAT IS SUBJECT TO JUDICIAL REVIEW.

Although we are confronted with several troubling issues in this appeal, especially whether the council's findings are adequate to support its decision, we conclude that the council's approval of the preliminary plat application is not a final decision that is subject to judicial review.

The local land use planning act (LLUPA), I.C. §§ 67–6501 through –6537, allows an "affected person aggrieved by a decision" to seek judicial review as provided in the administrative procedure act (APA), I.C. §§ 67–5201 through –5292. I.C. § 67–6521(1)(d). The LLUPA defines "affected person" as "one having an interest in real property which may be adversely affected by the issuance or denial of a permit authorizing the development." I.C. § 67–6521(1)(a).

According to the Eagle city code (the city code), a preliminary plat is "[t]he first formal presentation by drawings of a proposed subdivision." Eagle, *Id.*, City Code 9–1–6. Preliminary plat approval enables the applicant to survey the property and prepare a final plat. *Id.* 9–2–4: A. Approval of a final plat requires an intricate procedure, including a written application, review by the city administrator, possible review by the planning and zoning commission, review by other agencies, and action by the council. *Id.* 9–2–4. The city council may take the following actions concerning the final plat: "approve, approve conditionally, disapprove or table the final plat for additional information." *Id.* 9–2–4:C(3). In granting or denying approval of a final plat the council must specify "[t]he reasons for approval or denial," and "[t]he actions, if any, that the applicant could take to obtain a permit." *Id.* 9–2–4:C(3)(b) and (c). The city code also provides that before a building permit may be issued for construction or development in a floodplain, the developer must have a "development permit." *Id.* 10–1–7A.

In *South Fork Coalition v. Board of Comm'rs*, 112 Idaho 89, 730 P.2d 1009 (1986), the Court ruled that preliminary approval of a planned unit development by a county commission does not constitute a final decision that is subject to judicial review pursuant to the APA. *Id.* at 90, 730 P.2d at 1010. In

*South Fork,* the Court pointed out that the preliminary approval allowed the county commission "to either approve or deny the final plan after they have reviewed it and after they have 'placed such other restrictions [on it] as it deems advisable....'" *Id.*

Similarly, in the present case, the council's approval of the preliminary plat application is not final approval for the development of the subdivision, which will require approval of the final plat application and the floodplain permit application. Therefore, judicial review is premature.

## III.

### CONCLUSION

We vacate the district court's decision and remand the case to the district court for dismissal.

Because of this result, we award no costs on appeal.

TROUT, C.J., and McDEVITT, SILAK and SCHROEDER, JJ., concur.

938 P.2d 1214

Clark **PETERSEN**, Fred Olson, Marvin Packer, Nancy Higgs, Richard Owen, Terry Andrade and Debbie Andrade, Plaintiffs–Appellants–Cross Respondents,

v.

**FRANKLIN COUNTY**, A Political Subdivision of the State of Idaho, Acting Through the Franklin County Board of Commissioners, and Jeff Olson, Commissioner, Brad Smith, Commissioner, and Dale McKay, Commissioner, Defendants–Respondents–Cross Appellants.

No. 21943.

Supreme Court of Idaho, Pocatello, September 1996 Term.

May 30, 1997.

A. Bruce Larson, Soda Springs, for Plaintiffs–Appellants–Cross Respondents.

Anderson, Nelson & Hall, Idaho Falls, for Defendants–Respondents–Cross Appellants. Blake G. Hall argued.

SCHROEDER, Justice.

This is a combined appeal from a civil action brought pursuant to section 67–2347(4) of the Idaho Code, concerning the open meeting laws, and a petition for review of an agency action brought pursuant to the Idaho Administrative Procedure Act ("APA") as provided in section 39–7420(4) of the Idaho Code, concerning site selection of a solid waste landfill. The appellants are landowners ("Landowners") in Franklin County, Idaho, who own property bordering or near a proposed landfill site. The respondent is Franklin County, and its Board of County Commissioners, which is charged with the duty of selecting the landfill site.

## I.

## BACKGROUND AND PRIOR PROCEEDINGS

In 1970 the legislature enacted chapter 44, title 31 of the Idaho Code which provides that the board of county commissioners in each county is authorized to acquire, establish, maintain and operate solid waste disposal systems. I.C. §§ 31–4401, –4402. In 1992 the State of Idaho adopted the Idaho Solid Waste Facilities Act ("ISWFA"), I.C. §§ 39–7401 to –7421 (1993 & Supp.1996), which corresponds to the provisions of the Resource Conservation and Recovery Act, 42 U.S.C.A. §§ 6901 –6992K (West 1988).

On February 26, 1990, the Franklin County Commissioners ("Commissioners" or "Commission") were notified by the Idaho Department of Health and Welfare that under federal regulations the existing Franklin County landfill was subject to closure. 40 C.F.R. Parts 257 & 258 (1984). During the latter part of May 1992 the Commissioners toured Franklin County looking for potential sites to construct a new landfill. On one occasion the Commissioners were accompanied by the chairman of the geology department at Idaho State University. Five potential sites were identified as a result of these investigations including a site located approximately four miles northeast of Preston, Idaho. That site is referred to as the "Riverdale–Glendale" divide ("Riverdale–Glendale") and is the subject of this appeal.

The Commission discussed selecting a landfill site several times at regularly scheduled meetings, considered alternative site locations, formed a citizens' advisory group to help it evaluate waste disposal in the county, and entered into a contract with MSE, Inc. ("MSE"), an engineering firm, to have various hydrological and soil studies performed at the Riverdale–Glendale site.

On July 8, 1993, and July 12, 1993, the Commissioners and the advisory group made separate evaluations of the Riverdale–Glendale site and of four more sites previously identified as potential locations for a new landfill. The public was not given notice that either body would be evaluating potential sites.

No formal vote was taken nor resolution adopted by the Commission memorializing its intention to focus on the Riverdale–Glendale

site, but by July of 1993 the Commissioners had made a "conditional" decision arrived at by "common agreement" to concentrate their efforts on acquiring land at that site. On September 27, 1993, and September 30, 1993, the Commission obtained options to purchase and conduct studies of land located at the Riverdale–Glendale site. The land-purchase options were recorded on September 27, 1993, and October 5, 1993.

At their October 25, 1993, regular meeting the Commissioners held a lengthy discussion concerning the Riverdale–Glendale site and decided to pursue development of a new landfill at that site. However, minutes of the meeting show the Commissioners still referred to the site as the "proposed site."

At their January 10, 1994, regular meeting the Commissioners scheduled a public hearing for January 26, 1994, to receive public comment and review site certification documentation and a groundwater monitoring plan for the "proposed site." On January 12, 1994, and January 19, 1994, notice of the hearing was published in the *Preston Citizen,* the local newspaper.

At the January 26, 1994, public hearing the chairman of the Commission presented various reasons for selecting the Riverdale–Glendale site as the proposed site for the new landfill. The chairman was followed by a hydrogeologist who presented findings about the site. Comments for submission to the Idaho Department of Health and Welfare, Division of Environmental Quality ("DEQ") were also solicited. Shortly after the public hearing the Commissioners filed a Certification Application dated January 26, 1994, with the DEQ proposing development of the landfill site at Riverdale–Glendale. The Commission did not publish legal notice of the application as required by section 39–7408(d) of the Idaho Code. The Commission stated in the Certification Application that it had not adopted a land use plan or zoning ordinance.

On March 17, 1994, the Commissioners met with at least four Landowners who opposed locating the landfill at Riverdale–Glendale. An environmental engineer and a hy-

drogeologist were also present during this meeting which was apparently private. One of the Landowners asked if they had exhausted their administrative remedies at that point and apparently received an affirmative answer. The Landowners were also given guaranties that if the landfill impaired their culinary water supply the County would provide them with an alternative water source.

Later on March 17, 1994, the Commissioners met with other residents of Franklin County. No legal notice was given prior to this meeting, but an article appeared in the *Preston Citizen,* apparently sometime before March 17th, stating that the Commissioners would hold an "informational" meeting. Various presentations were made and the Commissioners were informed that a petition bearing the signatures of over 300 people opposed to locating a landfill at Riverdale–Glendale would be presented to them at their next meeting.

On March 16, 1994, the DEQ responded to the County's application stating that because Franklin County had no land use plan, the factors outlined in section 67–6508 of the Local Land Use Planning Act would have to be addressed prior to issuance of a site certification. The Commission filed a revised Certification Application with the DEQ on May 11, 1994. The Commissioners also submitted to the DEQ an affidavit of the Franklin County Clerk dated April 29, 1994, attesting that Franklin County had developed a land use plan, that there were "no planning and zoning restrictions in Franklin County," and that no "public hearings or consent are required to qualify the subject site pursuant to planning and zoning laws."

The Landowners filed their Complaint/Petition for Review on April 1, 1994, seeking judicial review of the Commission's site selection. The Landowners alleged: (1) that the Commissioner's decision was arbitrary and capricious, in excess of authority, and an abuse of discretion; (2) that the Commissioners had violated sections 67–2340 through 67–2347 of the Idaho Code by failing to make site selection decisions in accordance with

Idaho open meeting law; and (3) that the Commissioners had violated section 31–7107 of the Idaho Code by failing to provide for a method of initiative and/or referendum within the county.

The Commission moved to dismiss the Complaint/Petition for Review as time barred. The parties stipulated that the motion to dismiss would be treated by the district court as a motion for summary judgment. The district court determined that:

(1) no formal decision or roll-call vote was required for the County to make its site selection;

(2) although no formal decision was recorded regarding site selection, the Commissioners selected the site on October 25, 1993;

(3) the Landowner's petition for judicial review was not untimely due to the indeterminacy of when the Commissioners made their site selection;

(4) the Commissioners were not required to base their decision exclusively on the record;

(5) the County's failure to publish legal notice of its application with the DEQ was not a "fundamental error" in light of the Commissioners' compliance with numerous other statutory provisions concerning selection of the site;

(6) the site selection did not violate public meeting laws, nor was it based on unlawful procedure; and

(7) the Commission failed to provide a method for initiative and/or referendum in the County.

The district court entered summary judgment in favor of the Landowners on the issue of the County's failure to provide for initiative and/or referendum and awarded $4,500 in attorney fees. The district court entered summary judgment in favor of the Commission in all other respects.

The Landowners moved for reconsideration of the decision on the basis that the court failed to make a finding that the Com-

mission complied with section 39–7407(2)(d) of the Idaho Code which restricts landfill site locations. The Landowners alleged that the County had no land use plan, or if it did the site was located at variance with that plan. The Commission responded with an affidavit of the Commissioners stating that they had misunderstood a question in the original application for certification and so erroneously answered that Franklin County had no land use plan. The affidavit stated that the County has a land use plan which contains an analysis of the factors set forth at section 67–6508 of the Idaho Code.

The district court issued Supplemental Findings of Fact, Conclusions of Law and Judgment, in which it determined that the County had a land use plan but no zoning ordinance, and there was no evidence that the site location was at variance with that plan.

## II.

### STANDARD OF REVIEW ON SUMMARY JUDGMENT

In ruling on the Landowners' claim of a violation of the Idaho open meeting laws, I.C. §§ 67–2340, –2347, the district court granted summary judgment in favor of the Commission. When this Court reviews the district court's ruling on a motion for summary judgment it employs the same standard properly employed by the district court when originally ruling on the motion. *City of Chubbuck v. City of Pocatello*, 127 Idaho 198, 200, 899 P.2d 411, 413 (1995); *Friel v. Boise City Hous. Auth.*, 126 Idaho 484, 485, 887 P.2d 29, 30 (1994). Summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. I.R.C.P. 56(c); *Mutual of Enumclaw v. Box*, 127 Idaho 851, 852, 908 P.2d 153, 154 (1995). Both this Court and the district court liberally construe the record in favor of the nonmoving party, drawing all reasonable inferences and conclusions supported by the record in favor of that party. *City of Chubbuck*, 127 Idaho at 200, 899 P.2d at 413.

## III.

### ACTIONS ALLEGED TO BE IN VIOLATION OF THE OPEN MEETING LAWS MUST BE CHALLENGED WITHIN THIRTY DAYS OF THE ALLEGED VIOLATION TO BE DECLARED NULL AND VOID.

The Landowners challenge the district court's determination that the Commissioners did not violate Idaho's open meeting laws, arguing that there were steps taken in the site selection process that were not in compliance.

Section 67–2347 of the Idaho Code provides that if an action, or any deliberation or decision-making that leads to an action, occurs at any meeting which fails to comply with the open meeting laws the action is "null and void". Section 67–2347(4) provides for a private right of action, and any suit brought for the purpose of having an action declared "null and void" must be commenced within thirty (30) days of the time of the alleged violation. The question presented is the status of actions taken at a meeting which violated the open meeting laws: is the action null and void *ab initio,* as is indicated by the language of section 67–2347(1), or does the action only become null and void after a complaint is filed within the thirty (30) day period set forth in section 67–2347(4) and the court declares the action null and void?

 A statute should be construed so that effect is given to its provisions, and no part is rendered superfluous or insignificant. *Brown v. Caldwell Sch. Dist. No. 132,* 127 Idaho 112, 117, 898 P.2d 43, 48 (1995); *In re Matter of Permit No. 36–7200 in Name of Idaho Dep't of Parks & Recreation,* 121 Idaho 819, 822–23, 828 P.2d 848, 851–52 (1992). If actions in violation of the open meeting laws were void without a challenge, the provisions of I.C. § 67–2347(4) would be meaningless. Consequently, actions taken by the Commissioners that were not challenged

within the time provided by section 67–2347(4) are not void under the open meeting laws.

## IV.

### THE "FINAL" DECISION WAS MADE AT THE JANUARY 26, 1994 MEETING.

Section 67–2340 of the Idaho Code expresses the public policy of the State of Idaho that formation of policy should be conducted at open public meetings. Counties are among the "public agencies" which must comply with the open meeting laws. I.C. § 67–2341(4)(c). Under section 67–2342(1) meetings of governing bodies shall be open to the public, and no decision of a governing body of a public agency shall be made by secret ballot. A "governing body" is comprised of members of any public agency with the authority to make decisions for or recommendations to a public agency regarding any matter. I.C. § 67–2341(5). A "decision" is "any determination, action, vote or final disposition upon a motion, proposal resolution, order, ordinance or measure on which a vote of a governing body is required...." I.C. § 67–2341(1).

The district court found that the Commissioners made their final site selection at the October 25, 1993, meeting and that the meeting did not violate the open meeting laws. The record does not support the finding that the final site selection was made at the October 25, 1993 meeting. Drawing all reasonable inferences in favor of the non-moving party, the Landowners, the record establishes that the Commissioners made the "final" decision regarding site selection at their January 26, 1994 meeting at which time the Commission also announced it would submit its recommendation and findings to the DEQ for certification.[1] Following the meeting the County submitted the application to DEQ. The January 26, 1994 meeting was preceded by adequate notice and was attended by the public.

 This is not to say that the Commissioners may not have violated the open meet-

---

1. The County in briefing to this Court states:

"There can be no question that no later than January 26, 1994, the County had made the final decision selecting the site which it would pro-

that the decision was "final" when the applica-

